*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

STATE FARM BANK, FSB and GEORGE MEINBERG,
                    *Plaintiffs-Appellants,*

                    *v.*

JOHN B. REARDON, Superintendent of the Ohio
Division of Financial Institutions, in his official
capacity,

                    *Defendant-Appellee.*

No. 07-4260

>

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-00268—Edmund A. Sargus, Jr., District Judge.

Argued: July 30, 2008

Decided and Filed: August 22, 2008

Before: ROGERS and McKEAGUE, Circuit Judges; ADAMS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Howard N. Cayne, ARNOLD & PORTER, Washington, D.C., for Appellants. William J. Cole, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Howard N. Cayne, A. Patrick Doyle, Nancy L. Perkins, ARNOLD & PORTER, Washington, D.C., Thomas L. Long, BAKER & HOSTETLER, Columbus, Ohio, for Appellants. William J. Cole, William P. Marshall, Robert J. Krummen, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. Daniel Mosteller, CENTER FOR RESPONSIBLE LENDING, Washington, D.C., Stefan L. Jouret, DONOVAN HATEM, Boston, Massachusetts, Dirk S. Roberts, OFFICE OF CHIEF COUNSEL, OFFICE OF THRIFT SUPERVISION, Washington, D.C., for Amici Curiae.

---

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

---

**OPINION**

---

McKEAGUE, Circuit Judge.  State Farm Bank, a federal savings association and a wholly owned subsidiary of State Farm Mutual Automobile Insurance Co., offers mortgage products and banking services to individuals throughout the United States.  State Farm Bank does not maintain any "brick and mortar" branch offices that are open to the public; rather, it solicits and markets its mortgage products and banking services through its existing network of independent and exclusive insurance agents who have been specially trained to serve as mortgage lending and banking agents. The State of Ohio believes that State Farm Bank's exclusive agents must comply with the licensing and registration requirements set forth in the Ohio Mortgage Broker Act ("the Ohio Act"), Ohio Revised Code § 1322.01 *et seq.*

State Farm Bank argues that federal law governing the operations of federal savings associations preempts the application of the Ohio Act to its exclusive agents.  The Office of Thrift Supervision ("the OTS"), the federal agency charged with regulating federal savings associations, issued an opinion letter ("the OTS Opinion") agreeing with State Farm Bank.  Notwithstanding the OTS Opinion, the defendant-appellee, John B. Reardon, Superintendent of the Ohio Division of Financial Institutions ("the Superintendent"), declined to exempt State Farm Bank's exclusive agents from compliance with the Ohio Act.  State Farm Bank and one of its Ohio-based agents filed this action in the United States District Court for the Southern District of Ohio, seeking declaratory and injunctive relief.  The district court held that federal law does not preempt the application of the Ohio Act to State Farm Bank's exclusive agents.  We disagree and **REVERSE**.[1]

## I. BACKGROUND

**A.    Stipulated Facts**

During the district court proceedings, the parties stipulated to the following facts:

1.  Plaintiff State Farm Bank, F.S.B. is a federal savings association chartered by the OTS under the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq.*

2.  Under the Home Owners' Loan Act, the OTS, an office within the United States Department of Treasury, regulates, supervises and examines State Farm Bank.

3.  State Farm Bank is a wholly owned subsidiary of State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and is headquartered in Bloomington, Illinois.

4.  State Farm Bank offers financial products and services, including first and second mortgages and home equity lines of credit, to customers and potential customers nationwide. However, State Farm Bank does not maintain any branches, nor does it maintain any Bank offices that are open to the public.

---

[1]We recognize that provisions of the recently enacted Housing and Economic Recovery Act of 2008 ("the HERA") will significantly alter the regulatory landscape in this area and likely supersede this court's opinion in the future; however—as both parties readily conceded at oral argument—the HERA does not moot this appeal because the States are afforded at least one year to comply with the requirements set forth in the HERA.  When Ohio passes a new law in order to comply with the terms of the HERA, it may very well be that State Farm Bank's exclusive agents will be subject to such state regulation notwithstanding this opinion.  But until such a time, the application of the Ohio Act to State Farm Bank's exclusive agents is preempted.

5.   State Farm Bank markets its financial products and services to the public primarily through independent contractors, who are also licensed insurance agents of State Farm Mutual and who market insurance exclusively for or as otherwise authorized by State Farm Mutual.  The majority of State Farm Bank's independent contractor agents are individuals who maintain sole proprietorships, but some of the independent contractor agents are incorporated businesses.

6.  State Farm Bank requires each independent contractor agent who acts on behalf of State Farm Bank to enter into an exclusive agency agreement with State Farm Bank under which the contractor is permitted to market bank products and services only for State Farm Bank and not for any other banking or lending institution.

7.  The State Farm Bank independent contractor agents provide information to customers regarding the financial products and services offered by State Farm Bank and assist customers in completing and submitting applications for loans to State Farm Bank.  The independent contractor agents do not, however, evaluate loan applications, apply underwriting criteria, make lending decisions, or receive loan payments; those activities are performed by employees of State Farm Bank's loan operations office (in St. Louis, Missouri).

8.  State Farm Bank requires its independent contractor agents to complete prescribed in-house education and training programs, including training directed to compliance with applicable federal statutes, federal regulations, and OTS requirements related to the financial services and products offered by State Farm Bank.  Such training programs have been reviewed by the OTS during the course of its examination of State Farm Bank and its independent contractor agents.

9.  12 U.S.C. § 1463(a)(1) requires the Director of the OTS to provide for the examination, safe and sound operation, and regulation of savings associations.

10.  Pursuant to 12 U.S.C. § 1464(d)(7)(D), if a savings association causes any authorized service to be performed for the savings association by a person who is not a service company or subsidiary owned at least in part by the savings association (e.g., an independent contractor of the savings association such an as independent contractor agent of State Farm Bank), the performance of the service is subject to examination by the Director of OTS to the same extent as if the services were being performed by the savings association on its own premises.

11.  Plaintiff George Meinberg is an independent contractor agent of State Farm Bank and is engaged in the marketing of State Farm Bank's deposit products and services, but currently not mortgage loan products and services, in the State of Ohio.

12.  State Farm Bank intends to offer, through its independent contractor agents, first and second mortgages and home equity loans in the State of Ohio.

13.  Ohio Revised Code § 1322.01 *et seq.* requires persons who are not employees of depository institutions or subsidiaries or certain affiliates of depository institutions and who assist others in getting loans secured by mortgages on the borrowers' residences to obtain and maintain state mortgage broker licenses.

14.  On October 25, 2004, the OTS issued a formal opinion to State Farm Bank stating that: (1) State Farm Bank's exclusive independent contractor agents are subject to regulation, examination, and oversight by the OTS, and (2) federal law preempts state-level laws (including the laws and regulations of the State of Ohio) that might otherwise apply to the banking-related activities of State Farm Bank's exclusive independent contractor agents ("the OTS Opinion").

15.  State Farm Bank notified the Superintendent of the OTS Opinion that state mortgage broker licensing and related requirements are preempted with respect to the independent contractor

agents of State Farm Bank. In the notice, State Farm Bank provided the Superintendent with a copy of the OTS Opinion.

16. The Superintendent does not propose to examine or otherwise regulate State Farm Bank.

17. On its face, Ohio Revised Code § 1322.01 *et seq.* is applicable to and enforceable by the Superintendent against the independent contractor agents of State Farm Bank.

### B.        The Proceedings Below

State Farm Bank filed this action after the Superintendent refused to exempt State Farm Bank's exclusive agents from compliance with the Ohio Act, despite the OTS Opinion that federal law preempts application of the Ohio Act to the agents. After stipulating to the facts set forth above, the parties submitted the case to the district court on cross motions for summary judgment. The district court issued an opinion on October 10, 2007, rejecting State Farm Bank's arguments and holding that its exclusive agents were required to comply with the Ohio Act. The district court declined to follow the analysis set forth by the United States District Court for the District of Connecticut in *State Farm Bank, FSB v. Burke*, 445 F. Supp. 2d 207, 219-20 (D. Conn. 2006). The *Burke* court held—in a virtually identical case—that federal law preempted the application of Connecticut's mortgage broker law to State Farm Bank's exclusive agents. Unlike the *Burke* court, which deferred to an opinion by OTS that Connecticut's law was preempted, the district court here refused to defer to the OTS's conclusion that federal law preempts the application of the Ohio Act to State Farm Bank's exclusive agents. The district court largely declined to defer because it viewed the OTS Opinion as a legislative rule subject to notice and comment under the Administrative Procedures Act, 5 U.S.C. § 553(d)(2). The district court also independently reviewed applicable federal law and held that preemption was not warranted. State Farm Bank timely appealed.

## II. ANALYSIS

### A.        Standard of Review

A district court's decision granting summary judgment on the issue of preemption is reviewed *de novo*. *Millsaps v. Thompson*, 259 F.3d 535, 537 (6th Cir. 2001).

### B.        Federal Law Preempts the Application of the Ohio Act to State Farm Bank's Exclusive Agents

Although the parties and the *amici curiae* have submitted voluminous briefs addressing a number of topics, the ultimate question in this case is relatively straightforward: Does federal law preempt the application of the Ohio Act to State Farm Bank's exclusive agents? The briefs submitted in this case devote a significant amount of discussion to the issue of whether this court should defer to the OTS's conclusion that the Ohio Act is preempted. This seems to us to be a rather circuitous route to answering the ultimate question—a route that includes a detour through the muddied waters of administrative procedure and standards of judicial deference. This is a detour, however, that we need not take; reviewing the applicable statutory and regulatory provisions *de novo* leads this court to the conclusion that preemption is appropriate here. We reach this conclusion because the Ohio Act's application to State Farm Bank's exclusive agents fits within the categories of state laws that are expressly preempted by OTS regulations.[2] Moreover, preemption is

---

[2]The approach we take today (i.e., answering the preemption question without consideration of the OTS Opinion and the level of deference it should be afforded) is consistent with the Supreme Court's approach in *Watters v. Wachovia Bank, N.A.*, 127 S.Ct. 1559, 1572 (2007). In *Watters*, the Court determined that federal banking law preempted the application of a Michigan licensing and registration law to subsidiaries of a national bank. *Id.* The Court

appropriate here because requiring State Farm Bank's exclusive agents to comply with the Ohio Act would be inconsistent with Congress's intent that the powers of a federal savings association not be curtailed by state laws.[3]

### 1. Brief Overview of the Preemption Doctrine

The federal preemption doctrine has grown out of the Supremacy Clause of the United States Constitution, which provides in part "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. According to the Supreme Court, "[t]he phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." *City of New York v. FCC*, 486 U.S. 57, 63 (1988). Federal law may preempt state law either expressly or impliedly. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982). Express preemption exists where either a federal statute or regulation contains explicit language indicating that a specific type of state law is preempted. *See id*. at 153. Implied preemption has been subdivided into "field preemption" and "conflict preemption." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Field preemption exists "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id*. (internal quotations omitted). Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. (internal citations and quotations omitted). Regardless of the type of preemption at issue, this court's duty is to "determine whether state regulation is consistent with the structure and purpose" of applicable federal law. *Id*.

### 2. The OTS's Preemption Regulation

In this case, State Farm Bank argues, *inter alia*, that the Ohio Act, as applied to its exclusive agents, is expressly preempted by the OTS's preemption regulation, 12 C.F.R. § 560.2. The district court disagreed, holding that 12 C.F.R. § 560.2 does not expressly preempt state laws that govern the conduct of third-party agents who perform lending and banking activities on behalf of a federal savings association. *See State Farm Bank, F.S.B. v. Reardon*, 512 F. Supp. 2d 1107, 1119 (S.D. Ohio 2007). Thus, the court below drew a distinction between state regulation of a federal savings association, its employees, and subsidiaries who engage in lending and banking activities on behalf of an association and state regulation of exclusive agents who engage in the same conduct on behalf of an association. We agree with State Farm Bank that the district court's approach was overly narrow.

---

reached its conclusion without devoting any discussion to whether the Office of the Comptroller of the Currency's ("OCC") interpretation of the National Banking Act was entitled to *Chevron* deference. *Id*. The Court's failure to discuss the OCC's interpretation of the Act is especially significant because the lower courts who addressed the issue had decided the case based on *Chevron* deference to the OCC's interpretation of the applicable statute. *See id*. (explaining that its analysis of the preemption question rendered the level of deference owed to the OCC's interpretation "an academic question"); *see also* Ann Graham, *Searching for* Chevron *in Muddy* Watters*: The Roberts Court and Judicial Review of Agency Regulations*, 60 Admin. L. Rev. 229, 251-52 (2008) (explaining that the most surprising aspect of *Watters* is that the Court did not base its decision on, or even discuss, judicial deference to the agency's interpretation, despite the fact that the circuit court opinions on the issue had accorded *Chevron* deference to the OCC's interpretation of the statute).

[3]Even were we to address the OTS Opinion and the level of deference it should be afforded, the end result would be the same: the district court erred. The court incorrectly held that the OTS Opinion constitutes a legislative rule subject to notice and comment under the Administrative Procedures Act. As an agency interpretation of its governing statute and regulations, the OTS Opinion should have been afforded considerable weight by the district court. While there is certainly much more that we could say on this topic, such additional discussion is not necessary to the resolution of this appeal.

In 1933, Congress passed the Home Owners' Loan Act ("HOLA") to govern the activities of federal savings associations. *Silvas v. E\*Trade Mortgage Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008). HOLA created what is now the OTS[4] for the purpose of administering the statute, and it provided the OTS with "plenary authority" to promulgate regulations involving the operation of federal savings associations. *de la Cuesta*, 458 U.S. at 144-45. Pursuant to HOLA, OTS has "promulgated regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." *Id*. at 145 (internal quotations omitted). Commenting on the expanse of the OTS's regulatory power, the Supreme Court has stated that "[i]t would have been difficult for Congress to give the [OTS] a broader mandate." *Id*. at 161 (internal quotations omitted).

Acting in accord with this broad mandate, the OTS has promulgated two regulations that address preemption: 12 C.F.R. §§ 545.2 and 560.2. Section 545.2 is a more general regulation that expresses the well-established principle that the OTS has "plenary and exclusive authority . . . to regulate all aspects of the operations of Federal savings associations" and its "authority is preemptive of any state law purporting to address the subject of the operations of a Federal savings association." 12 C.F.R. § 545.2. Section 560.2 provides more specific guidance on the types of state laws that are preempted.

Section 560.2(a) states:

> To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), *OTS hereby occupies the entire field* of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, *without regard to state laws purporting to regulate or otherwise affect their credit activities* . . . For purposes of this section 'state law' includes any state statute, regulation, ruling, order or judicial decision.

12 C.F.R. § 560.2(a) (emphases added). The regulation goes on to provide the following thirteen, non-exclusive, examples of the "types of state laws preempted by" 12 C.F.R. § 560.2(a):

---

[4]HOLA initially established the Federal Home Loan Bank Board to regulate the conduct of federal savings associations; however, Congress replaced the Board with the OTS when it amended HOLA in 1989. *See* 12 U.S.C. § 1462a.

(1) *Licensing, registration*, filings, or reports by creditors;

(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

(3) Loan-to-value ratios;

(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

(6) Escrow accounts, impound accounts, and similar accounts;

(7) Security property, including leaseholds;

(8) Access to and use of credit reports;

(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

(10) *Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages*;

(11) Disbursements and repayments;

(12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f-7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and

(13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j-3 and part 591 of this chapter.

12 C.F.R. § 560.2(b) (emphases added).

Immediately following this list of preempted laws, the regulation sets forth the types of state laws that it does not preempt. *See* 12 C.F.R. § 560.2(c). The list in subsection (c) is prefaced with the statement that: "State laws of the following types are not preempted to the extent that they *only incidentally affect the lending operations* of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." *Id.* (emphasis added). The state laws generally excepted by 12 C.F.R. § 560.2(c) are:

(1) Contract and commercial law;

(2) Real property law;

(3) Homestead laws specified in 12 U.S.C. § 1462a(f);

(4) Tort law;

(5) Criminal law; and

(6) Any other law that OTS, upon review, finds:

> (i) Furthers a vital state interest; and

> (ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

Thus, 12 C.F.R. § 560.2(a) preempts state laws that have a direct impact on the banking and lending activities of a federal savings association, such as those listed in § 560.2(b), while § 560.2(c) preserves state laws of general applicability that only incidentally affect the banking and lending activities of a federal savings association.

Although this court has yet to address the preemptive effect of 12 C.F.R. § 560.2, both the First and Ninth Circuits have interpreted the regulation to preempt state laws that purport to regulate the conduct of federal savings associations. In *Silvas*, the Ninth Circuit held that 12 C.F.R. § 560.2 preempted a California law that purported to require E*Trade, a federal savings association, to refund mortgage "lock-in-fees" to consumers. *Silvas*, 514 F.3d at 1005-07. According to the *Silvas* court, 12 C.F.R. § 560.2(b) preempted the California law because it purported to regulate a federal savings association's loan-related fees and disclosures. *Id.*; *see also Haehl v. Washington Mut. Bank, F.A.*, 277 F. Supp. 2d 933, 939-42 (S.D. Ind. 2003) (finding that Indiana's regulation of reconveyance fees charged by a federal savings association was preempted by 12 C.F.R. § 560.2).

Similarly, in *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 182-84 (1st Cir.), *cert. denied* 546 U.S. 817 (2005), the First Circuit affirmed the district court's determination that 12 C.F.R. § 560.2 preempted a New York statute purporting to require the payment of interest on mortgage escrow accounts. The *Flagg* court extensively discussed the OTS's authority to promulgate 12 C.F.R. § 560.2, and concluded that the preemption regulation was well within HOLA's broad grant of authority to the OTS. *Id.* at 183-84. According to the court in *Flagg*, 12 C.F.R. § 560.2 reflects Congress's goal of "provid[ing] a consistent nationwide playing field while giving individual institutions a level of flexibility." *Id.* at 184. As *Flagg* makes clear, the OTS possessed the authority to promulgate 12 C.F.R. § 560.2 for the purpose of preempting state laws that the agency believes burden the ability of federal savings associations to exercise their federally-granted powers free from burdensome state regulation. *See id.* at 183; *see also de la Cuesta*, 458 U.S. at 153-54 (recognizing that when an agency promulgates a regulation that is intended to preempt state law, the regulation should not be disturbed unless there is evidence that it is contrary to congressional intent).

### a. The Applicability of 12 C.F.R. § 560.2

The Superintendent contends that 12 C.F.R. § 560.2 is irrelevant here because the Ohio Act applies directly to State Farm Bank's exclusive agents, not State Farm Bank. Essentially, the Superintendent contends that while 12 C.F.R. § 560.2 would preempt application of the Ohio Act to State Farm Bank, its employees, and its subsidiaries who engage in the solicitation and marketing of mortgage products, the regulation does not apply to State Farm Bank's exclusive agents who perform the same tasks on behalf of the bank. *See* Appellee's Br. at 24-26. This is so, says the Superintendent, because 12 C.F.R. § 560.2 does not specifically say that it preempts state laws that directly regulate the mortgage lending activities of a federal savings association's exclusive agents. In our opinion, such a view of the preemptive effect of 12 C.F.R. § 560.2 is incorrect. First, nothing in the text of 12 C.F.R. § 560.2 indicates that it only preempts state laws that directly regulate

federal savings associations. Rather, the regulation provides that it preempts laws "affecting the operations of federal savings associations," which indicates that the scope of the regulation is much broader than the Superintendent would have it. Second, the Superintendent's position is inconsistent with the Supreme Court's decision in *Watters*.

The Court in *Watters* recently rejected an argument similar to that advanced by the Superintendent today. *See Watters*, 127 S.Ct. at 1570. The precise issue in *Watters* was whether the National Banking Act and regulations promulgated by the OCC preempted state regulation of a national bank's mortgage lending activities where those activities were performed by a bank's operating subsidiary. *Id.* at 1564. The Commissioner of Insurance and Financial Services for the State of Michigan argued in *Watters* that Wachovia Mortgage, a Wachovia Bank operating subsidiary, was subject to Michigan's licensing and registration requirements. *Id.* at 1565. The Commissioner reasoned that federal law did not preempt the application of the Michigan requirements to Wachovia Mortgage because it was not a national bank. *Id.* at 1569.

The *Watters* Court was unpersuaded by the Commissioner's narrow interpretation of federal banking law, and we are likewise unpersuaded by the Superintendent's interpretation of 12 C.F.R § 560.2 in this case. According to the Court in *Watters*, federal banking law preempted the application of Michigan's requirements to Wachovia Mortgage because "[w]e have never held that the preemptive reach of [federal banking laws] extends only to a national bank itself. Rather, in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's *powers*, not on its corporate structure." *Id.* at 1570. Further illustrating that, for preemption purposes, it is the activity being regulated rather than the actor who is being regulated that matters, the Court stated that federal law protects "from state hindrance a national bank's engagement in the 'business of banking' whether conducted by the bank itself or by an operating subsidiary, empowered to do only what the bank itself could do." *Id.* at 1572.

Continuing with the theme of interpreting things in an overly narrow fashion, the Superintendent says *Watters* is inapposite because the Court's opinion only addressed preemption of state laws that regulate operating subsidiaries of a national bank, not exclusive agents of a federal savings association. The Superintendent is correct that *Watters* involved an operating subsidiary soliciting and marketing mortgages on behalf of a national bank, and this case involves an exclusive agent soliciting and marketing mortgages on behalf of a federal savings association. The distinction, however, is one without a difference and fails to appreciate the principle set forth by the Court in *Watters*. Properly understood, *Watters* stands for the proposition that when considering whether a state law is preempted by federal banking law, the courts should focus on whether the state law is regulating "the exercise of a national bank's power" not on whether the entity exercising that power is the bank itself. *Id.* at 1570. The Superintendent urges us to do the inverse; his argument focuses on the fact that the individuals being regulated are State Farm Bank's exclusive agents while ignoring the fact that the power being exercised is clearly that of a federal savings association.

Our interpretation of *Watters* finds support in a recent First Circuit decision dealing with the ability of a state to regulate the conduct of a bank's third-party agents. *See SPGGC, LLC v. Ayotte*, 488 F.3d 525, 532 (1st Cir. 2007), *cert. denied* 128 S.Ct. 1258 (2008). In *Ayotte*, U.S. Bank, a national bank, and Metabank, a federal savings association—referred to by the *Ayotte* court as a "federal thrift"—entered into a contract with Simon, a shopping mall operator. *Id.* at 527. Pursuant to the contract, Simon acted as the banks' agent by selling giftcards issued by U.S. Bank and Metabank at its malls. *Id.* The giftcards contained expiration dates and were subject to administrative fees. *Id.* The Attorney General for the State of New Hampshire alleged that the presence of expiration dates and the act of charging administrative fees violated the New Hampshire Consumer Protection Act. *Id.* Simon filed an action in federal court seeking declaratory and

injunctive relief on the grounds of federal preemption. *Id*. Both Metabank and U.S. Bank intervened in the suit. *Id*. at 530.

The First Circuit affirmed the district court's holding that federal banking law preempted the application of the New Hampshire statute to Simon. *Id*. The *Ayotte* court began its analysis by stating that both national banks and federal savings associations possess the authority under federal law to contract with third-party agents for the purpose of marketing and selling bank-issued giftcards. *Id*. at 531, 536. In an argument that mirrors the Superintendent's position in the instant case, the New Hampshire Attorney General argued that Simon was subject to the state law because the law directly regulated the conduct of Simon, a third-party agent who was not governed by federal banking law. *Id*. at 532. Relying on *Watters*, the First Circuit opined that the Attorney General's argument was "too formalistic" because "the question here is not *whom* the New Hampshire statute regulates, but rather, against *what activity* it regulates." *Id*. (citing *Watters*, 127 S.Ct. at 1570). The court in *Ayotte* further explained that it would defeat the purpose of federal banking law to allow states to avoid preemption of their statutes by enacting laws that prevent agents "from providing national banks with the resources to carry out their banking activities." *Id*. at 533. According to the *Ayotte* court, New Hampshire's regulation of Simon, a third-party agent, was preempted because it "significantly interfere[d]" with the ability of a federal bank to engage in activities permitted and regulated by federal law.[5] *Id*.

Consistent with the reasoning of *Watters* and *Ayotte*, we reject the Superintendent's argument that the OTS's preemption regulation, 12 C.F.R. § 560.2, is inapplicable here simply because the Ohio Act regulates State Farm Bank's exclusive agents and not State Farm Bank itself. As with the use of agents to sell bank-issued giftcards in *Ayotte*, federal law provides State Farm Bank with the authority to delegate the task of soliciting and marketing its mortgage products to exclusive agents. It is undisputed that State Farm Bank's exclusive agents are subject to regulation and oversight by the OTS. According to 12 U.S.C. § 1464(d)(7)(D), "if a savings association . . . causes to be performed for itself, by contract or otherwise, any service authorized under this chapter . . . (i) such performance shall be subject to regulation and examination by the [OTS] to the same extent as if such services were being performed by the savings association on its own premises." Additionally, 12 U.S.C. § 1464(d)(1)(B)(ii) requires that a federal savings association provide the OTS with "prompt and complete access" to its agents for regulatory purposes.[6] *See also Ayotte*, 488 F.3d at 535 (recognizing that the HOLA and the OTS permit federal savings associations to delegate their banking power to third-party agents). Having concluded that State Farm Bank possesses the authority to delegate the task of marketing and soliciting mortgage products and services to its exclusive agents, and that 12 C.F.R. § 560.2 applies to State Farm Bank's exclusive agents, we now turn to the question of whether the Ohio Act is the type of state law that 12 C.F.R. § 560.2 preempts.

---

[5]While the *Ayotte* court resolved the issue on the basis of conflict preemption rather than express preemption under 12 C.F.R. § 560.2, its reasoning regarding the ability of a state law to regulate the agents of a national bank applies with full force in this case.

[6]In addition to being regulated by the OTS, State Farm Bank's exclusive agents are also subject to continual oversight by State Farm Bank itself. The record indicates that if State Farm Bank's exclusive agents fail to comply with applicable laws and regulations, their agency relationship may be terminated. Thus, we are not confronted today with a situation where a federal savings association has contracted with non-exclusive, untrained, and unsupervised individuals, over whom it has no control, for the purpose of marketing and soliciting mortgage products in Ohio. Instead, we are confronted with a situation where Ohio is attempting to regulate a federal savings association's exclusive agents who are already subject to regulation by the OTS and State Farm Bank itself. *See generally* 12 C.F.R. § 560.2(a) (stating that the OTS desires its regulation to keep federal savings associations "free from undue regulatory duplication and burden").

### b. The Ohio Act Falls Within the Categories of State Laws Expressly Preempted by 12 C.F.R. § 560.2

By requiring State Farm Bank's exclusive agents to satisfy the Ohio Act's fairly onerous licensing and registration requirements, Ohio is "purporting to regulate or otherwise affect [the] credit activities" of State Farm Bank. *See* 12 C.F.R. § 560.2(a). When creating its business model, State Farm Bank made a conscious decision to market its products and services through its existing network of exclusive insurance agents who would receive OTS-reviewed training regarding mortgage lending and banking rules and regulations. It made this decision, ostensibly, for purposes of efficiency and to capitalize on the relationships that its exclusive agents have developed with their existing insurance clientele. *See generally* 12 C.F.R. § 560.2(a) (establishing that the preemption regulation is intended to ensure that federal savings associations are able to "efficiently deliver[]" services to the public). Permitting Ohio to frustrate State Farm Bank's decision as to how to best exercise its mortgage lending powers deprives State Farm Bank of the "maximum flexibility to exercise [its] lending powers in accordance with a uniform federal scheme of regulation." 12 C.F.R. § 560.2(a).

Moreover, the Ohio Act's licensing and certification requirements fall within the category of state laws that 12 C.F.R. § 560.2(b) specifically says are preempted; not only does the Ohio Act constitute a law regarding "licensing" or "registration", *see* 12 C.F.R. § 560.2(b)(1), it also affects—in more than an incidental manner—the "processing" and "origination" of mortgages, *see* 12 C.F.R. § 560.2(b)(10). Even if the Ohio Act were held not to fall within the class of state laws preempted by 12 C.F.R. § 560.2(b), preemption would still be appropriate here because the Ohio Act does not fit into any of the categories that 12 C.F.R. § 560.2(c) excludes from preemption, and the Ohio Act has more than an "incidental effect," *see* 12 C.F.R. § 560.2(c), on State Farm Bank's mortgage lending operations. *See generally* 61 Fed. Reg. 50951, 50966-67 (explaining that 12 C.F.R. § 560.2(c) is to be "interpreted narrowly," and any doubt about whether a state law is preempted by the regulation "should be resolved in favor of preemption).

In an argument that does more harm than good to his position, the Superintendent asserts that application of the Ohio Act to State Farm Bank's agents does not actually "prevent or significantly interfere" with the ability of the bank to exercise its mortgage lending power. Appellee's Br. at 26. He says that any injuries State Farm Bank may suffer as a result of the Ohio Act are "the self-inflicted result of [its] own business choice." *Id.* Therefore, the Superintendent reasons that State Farm Bank can avoid any harm by simply restructuring its entire business. This argument flies in the face of the Supreme Court's decision in *Watters*. After all, in *Watters*, Wachovia Bank could have avoided the effects of Michigan's licensing and registration regime by conducting mortgage solicitation and processing itself instead of delegating the task to its operating subsidiary, Wachovia Mortgage. The *Watters* Court obviously did not find such an argument persuasive, nor do we. *See Watters*, 127 S.Ct. at 1572 (stating that federal law prevents a state from hindering "a national bank's engagement in the 'business of banking' whether conducted by the bank itself or by an operating subsidiary").

It is somewhat difficult for us to comprehend how a law that requires State Farm Bank to either forgo mortgage lending in Ohio or radically alter its business model does not "prevent or significantly interfere" with the ability of a federal savings association to exercise its powers free from state obstruction.[7] *See id.* at 1567 (permitting States to regulate national banks if "doing so does not prevent or significantly interfere with the national bank's . . . exercise of its powers").

---

[7]State Farm Bank would be forced to make these drastic changes because under no circumstances could its current exclusive agents comply with the Ohio Act's requirement that a mortgage broker have at least three years of experience in the mortgage and lending field. This is so because the prior experience of State Farm Bank's exclusive agents is primarily in the insurance industry.

Likewise, it is difficult to reconcile the "choice" presented to State Farm Bank by way of the Ohio Act with the OTS's purpose of enabling federal savings associations to conduct their activities in an efficient manner free from "undue regulatory duplication and burden." 12 C.F.R. § 560.2(a). Were this court to agree with the Superintendent that the Ohio Act may be applied to State Farm Bank's exclusive agents, we would be opening the door to subjecting State Farm Bank and its exclusive agents to fifty separate and distinct licensing and regulatory schemes, all with their own requirements and procedural hurdles. Subjecting State Farm Bank and its exclusive agents to such a veritable "hodgepodge" of state regulation would not only be unduly burdensome, it would also be at odds with the very purpose behind federal regulation of federal savings associations. *See Conf. of Fed. Savings & Loan Assn's v. Stein*, 604 F.2d 1256, 1258 (9th Cir. 1979) (explaining that HOLA was passed to establish uniform regulations for federal savings associations and to eliminate the "hodgepodge" of state laws that had previously governed the associations).

To be sure, the Ohio Act directly regulates State Farm Bank's exclusive agents rather than State Farm Bank itself, but the activity being regulated is the solicitation and origination of mortgages, a power granted to State Farm Bank by HOLA and the OTS. This is also a power over which the OTS has indicated that any state attempts to regulate will be met with preemption.[8] *See* 12 C.F.R. § 560.2(b)(10); *see also Watters*, 127 S.Ct. at 1571 (indicating that a federal bank's security from state regulation "should adhere whether the business is conducted by the bank itself or is assigned to" another entity under the bank's control). Regardless of the gloss that the Superintendent attempts to place on the issue, the practical effect of the Ohio Act is that State Farm Bank must either change its structure or forgo mortgage lending in Ohio. Thus, "enforcement of the [Ohio Act] against [State Farm Bank's exclusive agents] would frustrate the purpose of the HOLA and the OTS regulations" because it "indirectly prohibits [State Farm Bank] from exercising the powers granted to it under the HOLA and the OTS regulations." *See Ayotte*, 488 F.3d at 536. The State of Ohio is not—nor is any state for that matter—entitled to impose such regulations on the powers of a federal savings association. Contrary to the Superintendent's argument, it is of no moment that Ohio passed the Act with the goal of protecting consumers. *See Ass'n of Banks in Ins. v. Duryee*, 270 F.3d 397, 408 (6th Cir. 2001) (explaining that a state law does not escape preemption simply because it was passed to protect consumers). Accordingly, the Ohio Act, as applied to State Farm Bank's exclusive agents, is preempted.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's decision and **REMAND** this matter for the entry of summary judgment in favor of State Farm Bank.

---

[8] Our opinion in this case that the Ohio Act is preempted as applied to State Farm Bank's exclusive agents does not necessarily mean that the Ohio Act is preempted as applied to non-exclusive agents who may have entered into contracts to perform some mortgage lending activities on behalf of several federal savings associations. We express no opinion here as to whether the Ohio Act would be preempted in such a situation.