*673 OPINION OF THE COURT
Charles Edward Ramos, J.
Defendants First American Corporation (First American) and First American eAppraiseIT (EAI) (together, defendants)[1] move to dismiss the complaint on the grounds that it is preempted by federal banking law and regulations, and for failure to state a cause of action (CPLR 3211 [a] [2], [7]).
This motion raises the issue of the preemptive effect of federal banking regulations on state law claims that seek to enforce standards of real estate appraiser independence and for fraudulent business practices arising out of the violation of those standards.
Background
Plaintiff, the People of the State of New York, by Attorney General Andrew Cuomo (AG), instituted this action on the basis of Executive Law § 63 (12), General Business Law § 349 and the common law against First American and EAI. First American provides real estate appraisal services to savings and loan institutions, banks, and other lenders through its wholly-owned subsidiary, EAI.
Nonparty Washington Mutual, Inc. (Wamu) is the country’s largest savings and loan institution. According to the complaint, Wamu is EAI’s largest client, providing nearly 30% of its New York customers.
The AG alleges that, in the course of their relationship with Wamu, defendants permitted EAI’s appraisers to be pressured into changing appraisal values that were too low in order to allow certain loans to proceed to closing. This conduct compromised EAI’s independence in providing unbiased valuations, to the detriment of consumers, and amounted to deceptive business practices under New York and federal law.
The AG points out that, in an unprecedented era of foreclosures and economic distress, the independence and integrity of the real estate appraisers who determine the value of loan collateral, the home, is of utmost importance. Undoubtedly, appraisal independence insures that a mortgage or home-equity loan is not under-collateralized, and protects borrowers from being overextended financially and lenders from loss of value in a foreclosure proceeding.
*674 Further, the AG highlights that mortgage brokers and lenders’ loan staff are paid on commission, the amount of which typically depends on the number of loans closed and on the size of the loan, a reality that permits an environment where appraisers are incentivized and pressured to value a home at the maximum possible amount, regardless of whether the appraisal accurately reflects the home’s value.
In this environment, the AG alleges that defendants’ independence, required under federal and state regulations, was unlawfully compromised.
According to the complaint, in the spring of 2006, Wamu retained two appraisal management companies — EAI and its top competitor, Lender’s Services, Inc. (LSI).
EAI employed both in-house and third-party fee appraisers, including a number of “preferred appraisers” identified by Wamu, to conduct appraisals on Wamu loan applications. Additionally, EAI allegedly hired approximately 50 former Wamu appraisers as staff appraisers, and gave them the authority to override and revise the values set by its in-house and third-party appraisers. In total, one third of EAI’s staff appraisers were former Wamu employees.
Pursuant to contractual arrangements between Wamu and EAI, Wamu could challenge an appraiser’s conclusions by requesting a “reconsideration of value” (ROV), when Wamu disagreed with an appraised home value set forth in an EAI appraisal report.
Shortly after Wamu retained EAI, its loan production staff allegedly began complaining that the appraisal values provided by EAI appraisers were too low in value to permit the loans to close. EAI’s president told Wamu executives that “[w]e need to address the ROV issue . . . The Wamu internal staff we are speaking with admonish us to be certain we solve the ROV issue quickly or we will all be in for some pretty rough seas” (complaint ¶ 30).
The following week, EAI’s executive vice-president explained to its president that Wamu’s loan officers routinely pressured EAI appraisers, specifying the exact value that they needed or asking for several ROVs on the same property. He indicated that it amounted to “direct pressure on the appraiser for a higher value without any additional information” (complaint ¶ 31).
During the latter part of 2006, defendants frequently discussed this growing pressure from Wamu. Wamu allegedly *675 indicated that it would be interested in expanding its business relationship with defendants “if the appraisal issues are resolved” (complaint ¶ 34).
In a December 2006 e-mail, one EAI executive told his colleagues that growing criticism from Wamu stemmed from the fact that “values are coming in lower with EAI” than with its top competitor (complaint ¶ 36).
In February 2007, Wamu allegedly directed EAI to stop using panels of staff and fee appraisers to perform Wamu appraisals, and instead demanded that EAI use appraisers selected by Wamu’s loan origination staff. EAI explained to First American Wamu’s motives for demanding the change: “Performance ratings to retain position as a Wamu proven appraiser will be based on how many come in on value, negating a need for an ROV” (complaint ¶ 38).
Ultimately, EAI capitulated to the pressure, in violation of appraisal independence standards. In a February 2007 e-mail, EAI indicated to First American that “we have agreed to roll over and just do it” (complaint ¶ 41). In an e-mail from the EAI president to Wamu executives, he allegedly indicated that “Wamu proven appraisers bring the value in a greater majority of the time ... I am fine with that, of course, and will happily assign Wamu orders to Wamu proven appraisers instead of eAppraiseit’s approved panel appraiser whenever possible” (complaint ¶ 42).
Internally, EAI allegedly began to consider the legal implications of its compromise of appraiser independence standards. An EAI executive vice-president warned that “it may be that the OTS [Office of Thrift Supervision] is OK with WAMU’s current way (maybe) but the new way seems to be quite a stretch” (complaint ¶ 45). In an April 2007 e-mail, an EAI executive vice-president explained that “we as an AMC need to retain our independence from the lender or it will look like collusion . . . The reasoning that there are fewer ROVs is . . . the proven appraisers bring in the values . . . Fun eh” (complaint ¶ 46).
Subsequently, EAI’s president wrote to senior executives at First American, and described EAI’s capitulation to Wamu pressure as “a violation of the OCC [Office of the Comptroller of the Currency], OTS, FDIC [Federal Deposit Insurance Corporation] and USPAP [Uniform Standards of Professional Appraisal Practice] influencing regulation” (complaint ¶ 48). In another memorandum prepared by EAI, it recognized that complying with the Wamu proven panel violated appraiser independence *676 regulations (complaint ¶¶ 49-51). Despite these legal concerns, by spring 2007, EAI permitted Wamu to be in virtual control of its appraisal panel. First American instructed EAI to continue its relationship with Wamu, even permitting Wamu’s loan production staff to remove EAI appraisers from the proven panel. One such EAI appraiser that was removed from the panel on Wamu’s demand wrote in an e-mail to EAI that,
“This is the second Wamu Appraisal quality assurance issue I have received from Wamu . . . Both as a result of an appraisal I completed that did not come in to their predetermined value for a ‘valued’ Wamu client. I was pressured for two weeks to change both my value and the conditions of my appraisal report . . . both of which were violations of US PAR FANNIE MAE and the Supplemental Standards I am required to observe and am bounded by . . . Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed that did not reach a pre-determined value” (complaint ¶ 81).
EAI’s internal appraisal log entries indicate that its appraisers created property values on appraisal reports after being told by Wamu loan production origination staff that such increases would help loans close.
On May 5, 2007, the AG issued a subpoena to First American. Subsequently, the AG commenced this action against defendants, asserting causes of action for fraudulent and deceptive business practices pursuant to Executive Law § 63 (12) and violation of General Business Law § 349, and unjust enrichment.
Previously, defendants removed the action to U.S. District Court for the Southern District of New York, and moved in that court to dismiss the complaint. The AG moved to remand the action, which was granted (People v First Am. Corp., 2008 WL 2676618, 2008 US Dist LEXIS 51790 [SD NY 2008]).
Discussion
Defendants move to dismiss the complaint on the ground that through two comprehensive federal statutes, the Home Owners’ Loan Act (HOLA) and the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), Congress broadly empowered the federal Office of Thrift Supervision to promulgate and enforce federal regulations governing all aspects of federal savings and loan activities, including the manner in *677 which appraisals are conducted in connection with mortgage loan transactions. On this basis, defendants argue that the federal regulations so thoroughly occupy the legislative field as to impliedly preempt the AG’s cause of action for violation of General Business Law § 349.
State law may be preempted through express statutory language, by implication, and when it actually conflicts with federal law (Balbuena v IDR Realty LLC, 6 NY3d 338, 356 [2006]).
Defendants do not identify any statute that expressly preempts General Business Law § 349. The more germane issue is whether the AG’s claims are impliedly preempted by the comprehensive scheme of federal law and regulations that exclusively govern the operations of savings and loan associations, such as Wamu, and banking institution-affiliated parties, such as defendants.
Implied preemption takes the form of either “field preemption” or “conflict preemption” (Balbuena, 6 NY3d at 356). Field preemption occurs when federal law so thoroughly occupies a legislative field “as to make reasonable the inference that Congress left no room for the States to supplant it” (id.). Conflict preemption will be found where compliance with both federal and state regulations is an impossibility, or where the “state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (id.).
I. Field Preemption
Undoubtedly, Congress intended to have a significant presence in the regulation of federal savings institutions. HOLA[2] created the OTS for the purpose of administering the statute, in order to promulgate regulations involving the operation of federal savings associations (Fidelity Fed. Sav. & Loan Assn. v De la Cuesta, 458 US 141, 144-145 [1982]).
In accordance with the broad mandate of HOLA, the OTS promulgated two regulations that address preemption, one of which is relevant to the issues raised in this action. 12 CFR 560.2 (a) states that Congress intends to occupy the legislative field with respect to state laws that affect the operations of *678 federal savings associations. Subdivision (b) contains a list of types of state laws preempted by OTS regulation, including state laws purporting to impose requirements regarding licensing by creditors, the ability of creditors to obtain mortgage insurance, terms of credit, loan-related fees such as prepayment penalties, escrow accounts, access to credit reports, disclosure and advertising, and “[processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages” (12 CFR 560.2 [b] [10]).
Immediately following this list of preempted laws, the regulation sets forth the types of state laws that it does not preempt, including tort, commercial and contract laws that only have an incidental effect on lending operations (12 CFR 560.2 [c]).
Thus, 12 CFR 560.2 (a) preempts state laws that have a direct impact on the banking and lending activities of a federal savings association, such as those listed in section 560.2 (b), while section 560.2 (c) preserves state laws that only incidentally affect the banking and lending activities of a federal savings association. Many courts have analyzed the preemptive effect of 12 CFR 560.2 on state laws that purport to regulate the conduct of federal savings associations (see e.g. Silvas v E*Trade Mtge. Corp., 514 F3d 1001, 1005 [9th Cir 2008]).
Real estate appraisals are not mentioned in 12 CFR 560.2. Moreover, the U.S. Supreme Court has yet to address the preemptive effect of these regulations on state laws that purport to address real estate appraisal standards.
Nonetheless, other regulations promulgated by the OTS pursuant to HOLA provide an informative glimpse into Congress’ intent with respect to preemption in the area of real estate appraisals.
FIRREA was passed in response to the federal savings and loan crisis that erupted in the mid-1980s. FIRREA sought to respond to the need to provide affordable housing mortgage financing and housing opportunities, and enhanced management of federal housing credit programs.
FIRREA established USPAP, a system of uniform national real estate appraisal standards (HR Rep 101-54, part I, 101st Cong, 1st Sess, reprinted in 1989 US Code Cong & Admin News, at 86, 103-104, 107 [1989]). Congress delegated articulation of USPAP standards and qualification for appraisal licensing and certification of appraisers to the Appraisal Foundation, a not-for-profit organization created under FIRREA. According to the *679 Appraisal Foundation, the real estate appraiser regulatory system established by FIRREA involves “the Federal Government, [and] the states” (Appraisal Foundation, http://www. appraisalfoundation.org/s_appraisal/sec.asp?CID=14&DID=14 [accessed June 9, 2009]). Consistent with this mandate, USPAP rules are expressly incorporated into both New York and federal law (19 NYCRR 1106.1; 12 USC § 3339).
Moreover, FIRREA sets forth requirements for using state certified and licensed appraisers in federally related transactions,[3] and permits the establishment of state agencies devoted to certifying and licensing appraisers (12 USC §§ 3331, 3336; 12 CFR 34.44, 546.3). It also established the Appraisal Subcommittee (12 USC § 3347) to “ensure that the states and the [Appraisal] Foundation meet the requirements that the states use certifying appraisers and the standards of professional practice to which appraisers are held by the states” (Appraisal Foundation, http://www.appraisalfoundation.org/s_appraisal/ sec.asp?CID=14&DID=14 [accessed June 9, 2009]).
According to the Appraisal Subcommittee, FIRREA created “a unique, complementary relationship between the States, the private sector, and the Federal government . . . [in] recognition] that the States are in the best administrative position to certify and license real estate appraisers and to supervise their appraisal-related activities” (Appraisal Subcommittee, https:// www.asc.gov/default.aspx?id=6 [accessed June 9, 2009]). Further, FIRREA relies on the states to “monitor and supervise compliance with appraisal standards and requirements” (Government Accounting Office, Opportunities to Enhance Oversight of the Real Estate Appraisal Industry, at 3, http:// www.gao.gov/new.items/d03404.pdf).
In the area of real estate appraisals, Congress expressly envisioned a unique regulatory system overseen and enforced by both the federal government and the states (see e.g. 12 USC §§ 3332, 3346-3348). This unique framework is in stark contrast to other OTS-regulated activities that are governed by federal law alone, because the activities directly impact some function of lending or the exercise of a national bank’s power (see e.g. State Farm Bank v Reardon, 539 F3d 336, 345-346 [2008]).
*680 Moreover, with respect to federally related transactions or USPAP violations, neither FIRREA nor HOLA provide an exclusive federal remedy for unlawful appraisal practices (Bolden v KB Home, 2008 WL 2899728, *5-8, 2008 US Dist LEXIS 65275, *12-14 [CD Cal 2008]; see also Beneficial Natl. Bank v Anderson, 539 US 1, 9 [2003] [an exclusive federal remedy supports complete preemption]).
Further, Congress did not provide for exclusive federal jurisdiction over USPAP Rather, by establishing USPAP as the source for real estate appraisal standards and expressly involving the states in overseeing certification, licensing and compliance with its standards, it is evident that Congress did not intend to occupy the entire field with respect to real estate appraisals.
In fact, FIRREA permits the states to impose additional appraisal standards if they consider such standards necessary to carry out their responsibilities (Appraisal Subcommittee, https:// www.asc.gov/html/frameSet.aspx7assetPatlWuploads/ Policy%20Statements\amendedpolicystatements.pdf [accessed June 9, 2009]).
Nearly all of the cases and expressions of federal intent that defendants cite to are fundamentally distinguishable, because they involve state law claims either brought under or based on a substantive state law rule specifically directed at banking or lending activities.
In fact, defendants fail to cite to any commentary by federal agencies or legislators that suggests that Congress intended federal law to occupy the entire field of real estate appraisals.
In fact, the opposite is true. Recently, the House of Representatives Report on the Activity of the Committee on Financial Services for the 110th Congress cited to a 2003 Government Accountability Office study that determined that “69 percent of States need more staffing for appraisal industry oversight, and 40 percent needed more resources to support related litigation efforts” (HR Rep 110-929, 110th Cong, 2d Sess [2009]). The report noted the need to respond to growing media attention to appraisal fraud, lender pressure, and faulty appraisals, and the effectiveness of the federal Appraisal Subcommittee “in overseeing State-based appraisal enforcement and licensing programs” (id.), thereby expressly acknowledging the states’ role in this field.
Therefore, the court concludes that federal regulation does not occupy the entire field with respect to real estate appraisal *681 regulation (accord, Bolden, 2008 WL 2899728, *5, 2008 US Dist LEXIS 65275, *13; Fidelity Natl. Info. Solutions, Inc. v Sinclair, 2004 WL 764834, 2004 US Dist LEXIS 6687 [ED Pa 2004]).
II. Conflict Preemption
The court must now determine whether application of New York law to enforce USPAP standards and to redress alleged fraudulent business practices relating to the violation of these standards conflicts with the accomplishment and execution of the federal objective that state laws should not “obstruct, impair or condition” a national bank’s ability to engage in real estate lending (see also OTS Rules and Regulations, 61 Fed Reg 50951-01, 50966 [1996] [the OTS standard for evaluating whether state laws are preempted under 12 CFR 560.2 is if the state law is not covered by subdivision (b), determining whether the law affects lending]). The OTS has explicitly disclaimed any intent to preempt nonconflicting state laws (OTS Rules and Regulations, 61 Fed Reg 50951-01, 50966 [1996]).
The court determines that the enforcement of USPAP standards to appraisers performing services in New York, and the application of General Business Law § 349, that prohibits businesses from making misrepresentations to its customers, do not impair a bank’s ability to lend and extend credit, nor do they conflict with federal law.[4]
The core of the complaint is that defendants allegedly misrepresented to their customers and the public at large that they were providing third-party, unbiased valuations that complied with USPAP standards. The allegations are that defendants violated USPAP appraisal independence rules, and that both their fee appraisers directly engaged by Wamu, and their staff appraisers engaged directly by their customers, engaged in deceptive business practices by violating these independence standards.
The complaint alleges numerous instances of violations of USPAP rules, including permitting the replacement of its fee and staff appraisers with appraisers hand-picked by Wamu because these appraisers altered appraisal valuations to allow loans to close, and permitting Wamu to direct the selection of appraisers to perform appraisals on particular assignments, while misleading customers into believing that they were obtain *682 ing accurate appraisals. USPAP prohibits an appraiser from performing as an advocate for any party in a transaction.
Further, the AG sufficiently alleges that this conduct is violative of General Business Law § 349, insofar as the intentional misleading of consumers in this state relating to the accuracy and independence of the performance of appraisals constitutes fraudulent and deceptive business practices that the AG may seek redress for (General Business Law § 349 [b]; see also Walts v First Union Mtge. Corp., 259 AD2d 322, 323 [1st Dept 1999], lv dismissed in part, denied in part 94 NY2d 795 [1999]).
Defendants have not articulated how the enforcement of USPAP standards under New York law or the application of General Business Law § 349 conflicts with federal law, or otherwise interferes with a bank’s nationwide operations or ability to lend.
The AG has authority to insist that companies such as defendants who perform real estate appraisal services for New York customers do so in accordance with USPAP standards, and free of deceptive business practices.
Defendants rely heavily on Cedeno v IndyMac Bancorp, Inc. (2008 WL 3992304, 2008 US Dist LEXIS 65337 [SD NY 2008]), a class action lawsuit brought on behalf of residential home mortgage borrowers against IndyMac Bancorp, Inc., alleging violations of federal statutes, and unfair business practices under California and New York law. The complaint alleged, inter alia, that IndyMac failed to disclose to plaintiffs that it selected appraisers and appraisal firms that inflated the value of residential property in order to allow IndyMac to complete more real estate transactions. Characterizing the plaintiffs’ claims that challenged IndyMac’s appraisal practices as a direct attack on the federal bank’s processing and origination of mortgages and loan-related fees, the court determined that the state law claims were preempted under HOLA.
First, the obvious distinction is that the defendants in that action were a federal savings bank and its holding company, whereas here, defendants are appraisal service providers.
Further, the conclusion that federal law occupies the entire field with respect to mortgage real estate appraisals is contrary to the unique regulatory framework that FIRREA established that expressly carved out roles for the federal government and the states in the certification and licensing of appraisers, in addition to the enforcement and compliance with USPAP standards (12 USC §§ 3332, 3338, 3346-3348).
*683 Moreover, it is a conclusion that is contrary to the holdings of the only other courts to directly address the issue (see Bolden, 2008 WL 2899728, *5-8, 2008 US Dist LEXIS 65275, *12-14; Fidelity Natl. Info. Solutions, Inc., 2004 WL 764834, 2004 US Dist LEXIS 6687; see also Watkins v Wells Fargo Home Mtg., 2008 WL 2490306, *4, 2008 US Dist LEXIS 47834, *13 [SD WV 2008]).
It is also contrary to the declarations of the regulatory agencies created by FIRREA, the Appraisal Foundation and the Appraisal Subcommittee, which were created to spearhead compliance with and enforcement of USPAE
Finally, there is simply no authority to conclude that Congress intended to treat real estate appraisal standards as part of the loan origination process. Many courts have considered the preemptive effect of HOLA on various types of state regulations that relate to the loan origination process and loan-related fees.
These holdings consistently find that regulations that seek to limit activities that directly impact fees such as the recovery of mortgage rate lock-in fees (Silvas v E*Trade Mtge. Corp., 514 F3d 1001, 1005 [2008]), reconveyance fees (Haehl v Washington Mut. Bank, F.A., 277 F Supp 2d 933 [SD Ind 2003]), and interest on mortgage escrow accounts (Flagg v Yonkers Sav. & Loan Assn., FA, 396 F3d 178 [2d Cir 2005], cert denied 546 US 817 [2005]), are preempted because they seek to regulate loan origination fees that are central to the exercise of a national bank’s power (State Farm Bank, 539 F3d at 345-346).
Although a lender or appraisal company charges a fee in order to conduct an appraisal, this fee is incidental to the standards of professional practice to which appraisers are held to under USPAP and state law, and which are the central issues in this action. Further, although the appraisal process is one segment of the overall scheme of loan origination, in light of FIRREA’s unique regulatory framework that delegates complementary roles to both the federal government and the states, the regulation of the standards of this activity is simply not an activity that Congress intended the preempted area of loan origination to encompass. For these reasons, defendants’ motion is denied.
Accordingly, it is ordered that defendants’ motion to dismiss is denied.

. Defendants assert that the complaint did not use their proper legal names, which are The First American Corporation and eAppraiseIT, LLC.

. HOLA was enacted in response to the Great Depression of the 1930s, and its purpose was to, inter alia, provide emergency relief with respect to home mortgage indebtedness due to spiraling foreclosures. With HOLA, Congress created a system of federal savings and loan associations, in order to ensure a reliable source for the financing of home mortgages (Dime Sav. Bank of N.Y., FSB v State of New York, 174 AD2d 173, 174 [2d Dept 1992]).

. A “federally related transaction” means any real estate-related financial transaction which, inter alia, a federal financial institution’s regulatory agency or the Resolution Trust Corporation engages in and that requires the services of an appraiser (12 USC § 3350 [4]; 12 CFR 564.2 [f]).

. The AG’s complaint also contains a claim for violation of Executive Law § 160-y, that prohibits a state certified or licensed real estate appraiser from accepting a fee for an appraisal assignment that is contingent upon the appraiser reporting a predetermined value. Defendants are not challenging this cause of action at this time.