[960 NE2d 927, 937 NYS2d 136]

THE PEOPLE OF THE STATE OF NEW YORK, by ANDREW M. CUOMO, Attorney General of the State of New York, Respondent, v FIRST AMERICAN CORPORATION et al., Appellants.

Argued October 11, 2011; decided November 22, 2011

**POINTS OF COUNSEL**

*DLA Piper LLP*, New York City (*Andrew L. Deutsch, Richard F. Hans* and *Kerry Ford Cunningham* of counsel), for appellants. I. The Appellate Division erred in holding that the Attorney General's use of State consumer protection laws to regulate Federal Savings Association (FSA) appraisal programs is not preempted by federal law governing FSA lending and appraisal activity. (*City of New York v FCC*, 486 US 57; *Silvas v*

*E\*Trade Mtge. Corp.*, 514 F3d 1001; *Fidelity Fed. Sav. & Loan Assn. v De la Cuesta*, 458 US 141; *Cipollone v Liggett Group, Inc.*, 505 US 504; *State Farm Bank v Reardon*, 539 F3d 336; *Lee v Astoria Generating Co., L.P.*, 13 NY3d 382; *Gade v National Solid Wastes Management Assn.*, 505 US 88; *Conference of Fed. Sav. & Loan Assns. v Stein*, 604 F2d 1256, 445 US 921; *Dime Sav. Bank of N.Y., FSB v State of New York*, 174 AD2d 173; *Mayor of City of N.Y. v Council of City of N.Y.*, 4 Misc 3d 151.) II. The Appellate Division erred in holding that the complaint states a claim under General Business Law § 349. (*Broder v Cablevision Sys. Corp.*, 418 F3d 187; *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F Supp 2d 222; *Burns Intl., Inc. v Western Sav. & Loan Assn.*, 978 F2d 533.)

Eric T. Schneiderman, Attorney General, New York City (*Richard Dearing, Barbara D. Underwood* and *Benjamin Gutman* of counsel), for respondent. I. Financial Institutions Reform, Recovery and Enforcement Act of 1989 demonstrates that federal law does not occupy the field of appraisal regulation. (*Medtronic, Inc. v Lohr*, 518 US 470; *Matter of People v Applied Card Sys., Inc.*, 11 NY3d 105.) II. Office of Thrift Supervision's preemption regulation does not override Financial Institutions Reform, Recovery and Enforcement Act of 1989 or otherwise reach this suit. (*Matter of M.B.*, 6 NY3d 437; *National Assn. of Home Builders v Defenders of Wildlife*, 551 US 644; *State Farm Bank v Reardon*, 539 F3d 336; *Fidelity Fed. Sav. & Loan Assn. v De la Cuesta*, 458 US 141; *SPGGC, LLC v Ayotte*, 488 F3d 525; *SPGGC, LLC v Blumenthal*, 505 F3d 183; *Pacific Capital Bank, N.A. v Connecticut*, 542 F3d 341; *Maurillo v Park Slope U-Haul*, 194 AD2d 142; *In re Ocwen Loan Servicing, LLC Mtge. Servicing Litig.*, 491 F3d 638; *Martinez v Wells Fargo Home Mtge., Inc.*, 598 F3d 549.) III. The complaint states a valid claim under General Business Law § 349. (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20; *Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314; *Bingham v New York City Tr. Auth.*, 99 NY2d 355; *Stutman v Chemical Bank*, 95 NY2d 24.)

**OPINION OF THE COURT**

CIPARICK, J.

This appeal arises out of an action commenced by the New York State Attorney General against defendants The First American Corporation (First American) and eAppraiseIT, LLC (eAppraiseIT) seeking injunctive and monetary relief as well as

civil penalties for violations of New York's Executive Law and Consumer Protection Act (*see* Executive Law § 63 [12]; General Business Law § 349) as well as the common law. The primary issue we are called upon to determine is whether federal law preempts these claims alleging fraud and violations of real estate appraisal independence rules. We conclude that federal law does not preclude the Attorney General from pursuing these claims against defendants.

## I.

First American provides real estate appraisal services to lending institutions, including savings and loan associations and banks. It supplies these services through its wholly owned subsidiary, eAppraiseIT, an appraisal management company that conducts business in New York. eAppraiseIT publicly advertises that its appraisals conform with the Uniform Standards of Professional Appraisal Practice (USPAP) and that they are "audited for compliance." USPAP, incorporated into both federal and New York law (*see* 12 CFR 34.44; 19 NYCRR 1106.1), requires appraisers to "perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests" (Advisory Standards Board, USPAP, Ethics Rule [2010-2011 ed], available at http://www.uspap.org/USPAP/frwrd/ETHICS_RULE.htm).

In a complaint filed in November 2007, the Attorney General initiated this action against defendants, pursuant to its authority under Executive Law § 63 (12) and General Business Law § 349, asserting claims that defendants engaged in repeated fraudulent and deceptive acts in the conduct of its business to the detriment of consumers and the public. The Attorney General also alleges that defendants "unjustly enriched themselves by receiving payment for independent, accurate, and legal appraisals, but failing to provide such appraisals" in violation of the common law.

According to the complaint, in the spring of 2006, nonparty Washington Mutual, Inc. (WaMu), then the largest nationwide savings and loan institution, retained eAppraiseIT and another company to perform independent appraisals on WaMu loan applications. WaMu soon became eAppraiseIT's largest client, providing close to 30% of its business in New York. The complaint alleges that, in response to stricter federal appraisal regulations, WaMu hired eAppraiseIT in order to create "a structural buffer between the banks and the appraisers that eliminates potential pressure or conflicts of interest."

Nevertheless, the Attorney General asserts that WaMu, throughout the course of its relationship with defendants, cajoled eAppraiseIT employees to augment the appraised values assigned to certain homes in order to allow the loans associated with those homes to proceed to closing. The complaint highlights that, shortly after WaMu hired eAppraiseIT, WaMu's loan production personnel complained that "eAppraiseIT's staff and fee appraisers were not 'hitting value,' that is, were appraising homes at a value too low to permit loans to close." On August 15, 2006, eAppraiseIT's executive vice-president advised the company's president that WaMu loan officers' unsubstantiated requests for appraisal adjustments amounted to "direct pressure on the appraiser[s] for a higher value without" justification.

Initially, eAppraiseIT management attempted to thwart the coercion exerted by WaMu. During the latter part of 2006, however, WaMu allegedly continued to express its dissatisfaction with the appraisal reports issued by eAppraiseIT. It purportedly indicated to First American that any future business with WaMu would be "expressly conditioned" on eAppraiseIT's ability to furnish appraisals with "high enough values." Furthermore, in February 2007, WaMu allegedly directed eAppraiseIT's to cease utilizing its panel of fee appraisers and instead employ appraisers from a panel previously selected by WaMu's loan origination staff who inflate the values of homes "in a greater majority of the time."

As a result of this mounting pressure, the complaint asserts that eAppraiseIT eventually capitulated to WaMu's demands. According to the Attorney General, by April 2007, "WaMu had complete control over eAppraiseIT's appraiser panel" and defendants knew that their compliance with WaMu "violated appraiser independence regulations" under USPAP.

The Attorney General filed the complaint in Supreme Court and defendants removed the action to the United States District Court for the Southern District of New York, asserting that District Court had federal question jurisdiction of the action (*see* 28 USC § 1331). Defendants also sought dismissal of the complaint in federal court. The Attorney General, in response, moved to remand the case back to Supreme Court. District Court granted the Attorney General's motion, and, in so doing, did not address defendant's motion to dismiss (*see People of New York ex rel. Cuomo v First Am. Corp.*, 2008 WL 2676618, 2008 US Dist LEXIS 51790 [SD NY 2008]).

Back in Supreme Court, defendants moved to dismiss the complaint pursuant to CPLR 3211. Defendants contended that the Home Owners' Loan Act (HOLA) (12 USC § 1461 *et seq.*) and the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) (Pub L 101-73, 103 US Stat 183) and their concomitant regulations preempt the Attorney General from raising these claims. Defendants premised their preemption arguments on two theories: they maintained that the relevant federal statutory and regulatory scheme occupied the entire field of real estate appraisals. Alternatively, defendants posited that New York's attempt to regulate eAppraiseIT conflicted with federal law in that it obstructed WaMu's ability to finance real estate transactions. Lastly, defendants asserted that the complaint failed to state a cause of action under General Business Law § 349.

Supreme Court denied the motion. Addressing the preemption arguments, Supreme Court first concluded that "federal regulation does not occupy the entire field with respect to real estate appraisal regulation" (*People v First Am. Corp.*, 24 Misc 3d 672, 680-681 [Sup Ct, NY County 2009]). The court reasoned that "[i]n the area of real estate appraisals, Congress expressly envisioned a unique regulatory system overseen and enforced by both the federal government and the states" (*id.* at 679). Supreme Court likewise concluded that defendants failed to "articulate[ ] how the enforcement of USPAP standards under New York law or the application of General Business Law § 349 conflicts with federal law, or otherwise interferes with a bank's nationwide operations or ability to lend" (*id.* at 682). Finally, the court opined that the Attorney General adequately pleaded a cause of action under General Business Law § 349.

The Appellate Division affirmed the order of Supreme Court. Before the Appellate Division, defendants abandoned their conflict preemption arguments (*see People v First Am. Corp.*, 76 AD3d 68, 72 [1st Dept 2010]) but still maintained that, given the comprehensive nature of HOLA and FIRREA, it is clear that Congress intended to occupy the entire home lending field. The Appellate Division disagreed and concluded, like Supreme Court, that Congress did not intend to occupy the entire field with respect to appraisal management companies (*see id.* at 73-76). The court also determined that the Attorney General articulated a cause of action under General Business Law § 349 and had standing to do so, reasoning that the complaint "references misrepresentations and other deceptive conduct allegedly

perpetrated on the consuming public within the State of New York" (*id.* at 83).

The same panel of the Appellate Division granted defendants leave to appeal to this Court and certified a question inquiring whether its order, which affirmed the order of Supreme Court, was "properly made" (2010 NY Slip Op 84106[U] [2010]). We now affirm and answer the certified question in the affirmative.

## II.

Preemption analysis begins, as always, with reference to the well-familiar Supremacy Clause of the United States Constitution, which provides that federal laws "shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (US Const, art VI, cl 2). Indeed, the Supremacy Clause "vests in Congress the power to supersede not only State statutory or regulatory law but common law as well" (*Guice v Charles Schwab & Co.*, 89 NY2d 31, 39 [1996], *cert denied* 520 US 1118 [1997]). In determining whether federal law preempts state law, the United States Supreme Court has instructed that a court's "sole task is to ascertain the intent of Congress" (*California Fed. Sav. & Loan Assn. v Guerra*, 479 US 272, 280 [1987]; *see also Medtronic, Inc. v Lohr*, 518 US 470, 485 [1996] ["(T)he purpose of Congress is the ultimate touchstone in every pre-emption case"] [internal quotation marks omitted]; *Matter of People v Applied Card Sys., Inc.*, 11 NY3d 105, 113 [2008]).

Of course, "[p]reemption can arise by: (i) express statutory provision, (ii) implication, or (iii) an irreconcilable conflict between federal and state law" (*Applied Card Sys.*, 11 NY3d at 113, citing *Balbuena v IDR Realty LLC*, 6 NY3d 338, 356 [2006]). This appeal requires us to focus our analysis solely on implied preemption or field preemption, which occurs when:

> "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . . [o]r the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" (*Rice v Santa Fe Elevator Corp.*, 331 US 218, 230 [1947]).

In that regard, defendants insist that "HOLA and FIRREA so occupy the field that these two statutes preempt any and all state laws speaking to the manner in which appraisal management companies provide real estate appraisal services" (*First Am. Corp.*, 76 AD3d at 73). We disagree.

The Great Depression of the 1930s and the financial devastation that ensued triggered Congress to enact HOLA. HOLA created "a system of federal savings and loan associations, which would be regulated by the [Federal Home Loan Bank] Board" (FHLBB) (*Fidelity Fed. Sav. & Loan Assn. v De la Cuesta*, 458 US 141, 160 [1982]). The purpose of this comprehensive legislation was "to provide emergency relief with respect to home mortgage indebtedness at a time when as many as half of all home loans in the country were in default" (*id.* at 159 [internal quotation marks and citations omitted]). HOLA gave the FHLBB "plenary authority" to "promulgate[ ] regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave" (*id.* at 144-145 [internal quotation marks and citation omitted]).

During the mid-1980s, the federal savings and loan crisis erupted, prompting Congress in 1989 to pass FIRREA. In enacting FIRREA, Congress restructured the regulation of federal savings and loan associations by disbanding the FHLBB and replacing it with the Office of Thrift Supervision (OTS) (*see* FIRREA, Pub L 101-73, tit III, § 301, 103 US Stat 183, 277, amending 12 USC § 1461 *et seq.* [establishing the OTS]; Pub L 101-73, tit IV, § 401, 103 US Stat 183, 354, repealing 12 USC § 1437 [*see* 12 USCA § 1437, Historical and Statutory Notes (disbanding the FHLBB)]). As relevant here, FIRREA's legislative history reveals that Congress designed the statute, in part, "to thwart real estate appraisal abuses . . . [by] establish[ing] a system of uniform national real estate appraisal standards" (HR Rep 101-54[I], 101st Cong, 1st Sess, at 311, reprinted in 1989 US Code Cong & Admin News, at 107; *see also* 12 USC § 3331 ["real estate appraisals utilized in connection with federally related transactions are performed . . . in accordance with uniform standards"]).

To effectuate this stated goal, Congress enacted 12 USC § 3339 as part of FIRREA, which mandates that the OTS "prescribe appropriate standards for the performance of real estate appraisals." The statute "require[s], at a minimum . . . that real estate appraisals be performed in accordance with generally accepted appraisal standards as evidenced by the appraisal standards promulgated by the Appraisal Standards Board of the

Appraisal Foundation" (12 USC § 3339 [1]). In 1987, prior to the FIRREA legislation, the United States appraisal profession formed The Appraisal Foundation, a private "not-for-profit organization dedicated to the advancement of professional valuation" (The Appraisal Foundation, http://appraisalfoundation.org [accessed Nov. 14, 2011]). The Appraisal Foundation established USPAP and the Appraisal Standards Board, appointed by The Appraisal Foundation and referenced by FIRREA, "develops, interprets and amends" USPAP (id.). As noted earlier, New York has also incorporated USPAP rules into state law (see 19 NYCRR 1106.1).

In aiming to prevent further real estate appraisal abuse, Congress envisaged a robust partnership with the states. To that end, FIRREA sanctions the establishment and use of state agencies dedicated to certifying and licensing appraisers[1] and delineates requirements for using these appraisers in federally related transactions (see 12 USC §§ 3331, 3336; 12 CFR 34.44, 564.3).[2] Furthermore, under FIRREA, Congress created the Appraisal Subcommittee, charged with "monitor[ing] State appraiser certifying licensing agencies for the purpose of determining whether a State agency's policies, practices, and procedures are consistent with this chapter" (12 USC § 3347 [a]; see also 12 USC § 3348 [c]). According to the Appraisal Subcommittee, FIRREA "recognize[s] that the States [are] in the best administrative position to certify and license real estate appraisers and to supervise their appraisal-related activities" and permits the States to impose stricter appraisal standards as necessary (Appraisal Subcommittee, https://www.asc.gov/Legal-Framework/TitleXI.aspx [accessed Nov. 14, 2011]). Thus, this subcommittee has observed that FIRREA "created a unique, complementary relationship between the States, the private sector, and the Federal government" (id.).

Consistent with this understanding of FIRREA, OTS itself stated that a financial "institution should file a complaint with the appropriate state appraiser regulatory officials when it suspects that a state certified or licensed appraiser failed to comply with USPAP, applicable state laws, or engaged in other

1. Contrary to defendants' assertion, for purposes of FIRREA, we see no distinction between an individual appraiser and an appraisal management company. FIRREA reaches both.

2. As relevant here, a "federally related transaction" means "any real estate-related financial transaction which . . . requires the services of an appraiser" (12 USC § 3350 [4] [B]).

unethical or unprofessional conduct" (OTS, Mem for Chief Executive Officers, *Final Interagency Appraisal and Evaluation Guidelines*, CEO Ltr 371, at 23 [Dec. 2, 2010], http://www.ots.treas.gov/_files/25371.pdf [accessed Nov. 14, 2011]).[3] Similarly, the United States Government Accountability Office, an independent, nonpartisan agency that works for Congress, has observed that FIRREA "relies on the states to . . . monitor and supervise compliance with appraisal standards and requirements" (Government Accountability Office, Report to Congressional Requesters, *Regulatory Programs: Opportunities to Enhance Oversight of the Real Estate Appraisal Industry*, at 3 [GAO-03-404, May 2003], available at http://www.gao.gov/new.items/d03404.pdf [accessed Nov. 14, 2011]).

Despite FIRREA's clear mandate to induce states to regulate real estate appraisers in partnership with federal agencies,[4] defendants ask us to find that 12 CFR 560.2, a subsequent regulation promulgated by the OTS pursuant to its authority under HOLA, nonetheless, supports preemption. 12 CFR 560.2 (a) states that "OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations." The regulation further provides that "[t]o enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public

3. OTS's interpretation of FIRREA remains unchanged. In its 1994 *Interagency Appraisal and Evaluation Guidelines*, rescinded after the release of the 2010 addition, OTS likewise called upon financial institutions "to make referrals directly to state appraiser regulatory authorities when a State licensed or certified appraiser violates USPAP . . . Examiners finding evidence of unethical or unprofessional conduct by appraisers will forward their findings and recommendations to their supervisory officers for appropriate disposition and referral to the state, as necessary" (OTS, Thrift Bulletin, *Interagency Appraisal and Evaluation Guidelines*, at 10 [Nov. 4, 1994], http://www.ots.treas.gov/_files/84042.pdf; *see also First Am. Corp.*, 76 AD3d at 75-76).

4. We observe that the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (*see* Pub L 111-203, 124 US Stat 1376), enacted by Congress after the commencement of this lawsuit, confirms this understanding. For example, 12 USC § 3353 (a) (1) requires appraisal management companies to comply with USPAP and "register with and be subject to supervision by a State appraiser certifying and licensing agency in each State in which such company operates." Significantly, that statute states that "[n]othing in this section shall be construed to prevent States from establishing requirements in addition to any rules promulgated" herein (12 USC § 3353 [b]; *see also* 12 USC § 1465 [b] [observing that HOLA "does not occupy the entire field in any area of State law" unless such state law conflicts with federal law]).

free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations."

Paragraph (b) of 12 CFR 560.2 lists illustrative examples of the categories of state laws, such as mortgage processing and origination, preempted under paragraph (a). 12 CFR 560.2 (c), however, states that certain types of state laws, such as contract and commercial law and tort law, are not preempted "to the extent that they only incidentally affect the lending operations of Federal savings associations." According to the OTS, in analyzing whether 12 CFR 560.2 preempts a state law, "the first step [is] to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted" (61 Fed Reg 50951, 50966-50967 [1996]). Applying this first step, we note the examples recorded in paragraph (b) do not mention real estate appraisals. We also conclude, in accord with the Appellate Division, that the Attorney General's challenge to defendants' alleged misconduct under state law does not correspond with any of the categories of law preempted by paragraph (b).

The OTS further instructs that, "[i]f the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does . . . the presumption arises that the law is preempted" (id.; see also 12 CFR 560.2 [c]). Here, the crux of the Attorney General's complaint is that defendants engaged in unlawful and deceptive business practices in that they failed to adhere to the requirements of USPAP. We conclude the Attorney General's authority to prosecute First American and its subsidiary eAppraiseIT—an independent appraisal management company—for such faulty practices under Executive Law § 63 (12) and General Business Law § 349 is not preempted because, at most, it would incidentally affect the lending operations of a federal savings association (accord 1996 Ops Chief Counsel OTS, RE: Preemption of State Laws Applicable to Credit Card Transactions, at 10 [Dec. 24, 1996], available at 1996 WL 767462 and http://www.ots.treas.gov/_files/56615.pdf [concluding that impact on lending of an Indiana statute outlawing deceptive acts and practices was "only incidental to the primary purpose of the statute—the regulation of the ethical practices of all businesses

engaged in commerce"]; *see also In re Ocwen Loan Servicing, LLC Mtge. Servicing Litig.*, 491 F3d 638, 643 [7th Cir 2007]).[5]

■■ In conclusion, we hold that FIRREA governs the regulation of appraisal management companies and explicitly envisioned a cooperative effort between federal and state authorities to ensure that real estate appraisal reports comport with USPAP. We perceive no basis to conclude that HOLA itself or federal regulations promulgated under HOLA preempt the Attorney General from asserting both common law and statutory state law claims against defendants pursuant to its authority under Executive Law § 63 (12) and General Business Law § 349. Thus, defendants' motion to dismiss on the grounds of federal preemption was properly denied. We also agree with the Appellate Division that the Attorney General has adequately pleaded a cause of action under General Business Law § 349 and that the statute provides him with standing.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

READ, J. (dissenting). The Depression-era Home Owners Loan Act (HOLA) (12 USC § 1462 *et seq.*), until recently amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act) (Pub L 111-203, 124 US Stat 1376 [2010]), occupied the field of the regulation of federal savings associations (FSAs) and was implemented by the Office of Thrift

---

5. In concluding that HOLA preempts this lawsuit, our dissenting colleague principally relies on the analysis of two federal district court cases, *Cedeno v IndyMac Bancorp, Inc.* (2008 WL 3992304, 2008 US Dist LEXIS 65337 [SD NY 2008]) and *Spears v Washington Mut., Inc.* (2009 WL 605835, 2009 US Dist LEXIS 21646 [ND Cal 2009]). According to the dissent, this Court should "adopt the federal courts' interpretation of a federal statute unless that interpretation appears to be plainly wrong" (dissenting op at 197). We observe, however, that other federal district courts, consistent with our analysis, have concluded that HOLA does not preempt claims related to real estate appraisals (*see e.g. Bolden v KB Home*, 618 F Supp 2d 1196, 1205 [CD Cal 2008] [finding that OTS regulations under HOLA do not preempt plaintiffs' claims since those "claims relate to real estate appraisal standards, whereas . . . HOLA was concerned with the credit activities of federal savings associations"]; *Fidelity Natl. Info. Solutions, Inc. v Sinclair*, 2004 WL 764834, 2004 US Dist LEXIS 6687 [ED PA 2004] [concluding that state laws regulating real estate appraisals do not target federal savings associations or national bank operations]).

Supervision (OTS).[1] Further, HOLA's broad language "expresse[d] no limits on the [OTS's] authority to regulate the lending practices of [FSAs]," such that "[i]t would have been difficult for Congress to give the [OTS] a broader mandate" (*Fidelity Fed. Sav. & Loan Assn. v De la Cuesta*, 458 US 141, 161 [1982] [internal quotation marks omitted] [discussing the power of the Federal Home Loan Bank Board, OTS's predecessor]). The issue here is whether the real estate appraisal activities that are the subject of this lawsuit fall within the field occupied by OTS in the exercise of its broad regulatory authority over FSAs, thus preempting this action for injunctive and monetary relief (i.e., disgorgement of profits, including appraisal fees paid by borrowers, restitution and damages) for alleged violations of Executive Law § 63 (12) (fraudulent or illegal business practices), General Business Law § 349 (deceptive acts or practices) and unjust enrichment. The federal courts that have considered the comparable question (in particular, the United States District Court for the Southern District of New York) have answered in the affirmative (*see Cedeno v IndyMac Bancorp., Inc.*, 2008 WL 3992304, 2008 US Dist LEXIS 65337 [SD NY 2008]; *Spears v Washington Mut., Inc.*, 2009 WL 605835, 2009 US Dist LEXIS 21646 [ND Cal 2009]). Since I would not second-guess how the federal courts have reasonably interpreted the preemptive effect of a federal statute, I respectfully dissent.

## I.

## Federal Preemption under HOLA

To carry out its "broad[ ] mandate" under HOLA with respect to the lending practices of FSAs, OTS "promulgated

---

**1.** The Dodd-Frank Act brought about a sea change in HOLA preemption: the Act provides that HOLA does *not* occupy the field in any area of law, and conforms the preemption standard applicable to FSAs to the conflict preemption standard for national banks delineated by the United States Supreme Court in *Barnett Bank of Marion Cty., N. A. v Nelson* (517 US 25, 31 [1996] [state laws may be preempted where they are in "irreconcilable conflict" with federal statutes, which may occur where compliance with both laws is impossible, or where the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (citations omitted)]; *see* 12 USC § 1465 [a], [b]). Defendants First American Corporation and First American eAppraiseIT readily acknowledge that the Attorney General's lawsuit would *not* be preempted under the Dodd-Frank Act's conflict preemption standard. The new standard for FSAs is not retroactive, however, and only became effective on July 21, 2011, the date when OTS was transferred to the Office of the Comptroller of the Currency (OCC) (*see* Pub L 111-203, tit X, §§ 1046, 1047 [b]; § 1048, 124 US Stat 1376, 2017). On October 19, 2011, 90 days after this transfer, OTS ceased to exist (*see* 12 USC § 5413).

regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave," and "regulate[d] comprehensively the operations of these associations, including their lending practices and, specifically, the terms of loan instruments" (*De la Cuesta*, 458 US at 145, 161, 167 [internal quotation marks omitted]).

In 12 CFR 560.2 (a), entitled "Occupation of field," OTS expressed its preemptive intent in the clearest possible terms:

> "OTS is authorized to promulgate regulations that preempt state laws affecting the operations of [FSAs] . . . OTS hereby occupies the entire field of lending regulation for [FSAs]. OTS intends to give [FSAs] maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, [FSAs] may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section . . . For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision" (12 CFR 560.2 [a]).

OTS then sets out 13 "[i]llustrative examples" of the "types of state laws preempted by [12 CFR 560.2 (a)], without limitation." As relevant to this discussion, these examples include

> "state laws purporting to impose requirements regarding:
> "(5) Loan-related fees
> "(9) Disclosure and advertising . . . [and]
> "(10) Processing, origination, servicing . . . [of] mortgages" (12 CFR 560.2 [b]).

Immediately following the nonexclusive list of types of preempted laws, the regulation identifies types of state laws that "are not preempted to the extent that they only incidentally affect the lending operations of [FSAs] or are otherwise consistent with the purposes of paragraph (a) of this section" (12 CFR 560.2 [c]). These laws include

> "(1) Contract and commercial law; (2) Real property law; (3) Homestead laws specified in 12 U.S.C.

1462a(f); (4) Tort law; (5) Criminal law; and (6) Any other law that OTS, upon review, finds: (i) Furthers a vital state interest; and (ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section" (12 CFR 560.2 [c]).

OTS adopted 12 CFR 560.2 in 1996 to express its "longstanding position . . . on the federal preemption of state laws affecting the lending activities of federal savings associations," meant to "confirm and carry forward its existing preemption position" (OTS, Final Rule, 61 Fed Reg 50951, 50965 [1996]). Stated another way, OTS explained that

"[b]ecause lending lies at the heart of the business of a federal thrift, OTS and its predecessor . . . have long taken the position that the federal lending laws and regulations occupy the entire field of lending regulation for [FSAs], leaving no room for state regulation. For these purposes, the field of lending regulation has been defined to encompass *all laws affecting lending by federal thrifts, except certain specified areas such as basic real property, contract, commercial, tort, and criminal law*" (*id.* [emphasis added]).

OTS then provided the courts with an interpretive framework for 12 CFR 560.2, as follows:

"When confronted with interpretive questions under § 560.2, we anticipate that courts will, in accordance with well established principles of regulatory construction, look to the regulatory history of § 560.2 for guidance. In this regard, OTS wishes to make clear that the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by [FSAs]. When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed

only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, *paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption"* (*id.* at 50966-50967 [emphasis added]).

## II.

### *Cedeno*

*Cedeno* was a purported class action brought on behalf of the plaintiff and a similarly situated class of residential home mortgage borrowers against defendant IndyMac, an FSA, and its receiver, the Federal Deposit Insurance Corporation (FDIC). The plaintiff alleged violations of two federal statutes, California's deceptive practice law and New York's General Business Law § 349, and claimed breach of contract and unjust enrichment.

IndyMac moved to dismiss all claims, and asserted federal preemption as the basis for dismissing the plaintiff's state law claims. In deciding the motion, the judge accepted as true the plaintiff's allegations that IndyMac did not "disclose to the plaintiff that it selected appraisers, appraisal companies and/or appraisal management firms who performed faulty and defective appraisal services which inflated the value of residential properties in order to allow [IndyMac] to complete more real estate transactions and obtain greater profits"; neglected "to provide the necessary insulation and separation between its own internal production or sales personnel responsible for providing the mortgage services . . . and the credit or valuation personnel who were responsible for overseeing and verifying the accuracy of the appraisal services," which led to "pressure" for "approv[al of] inflated appraisals so that loans and profits could be increased"; failed "to ensure that the appraisals were accurate and allowed its own quality control staff to approve inflated and defective appraisals"; "communicated" to appraisers "that there was a certain 'target value' or 'qualifying value' necessary to close the loan" so that they "understood that if they met the targeted value, they would be selected for future referral of business from IndyMac"; and "hired appraisal management firms or appraisers whose prior performance repeatedly returned the values needed to match the qualifying loan values" (2008 WL 3992304, *1, *2, 2008 US Dist LEXIS 65337, *2, *5-6).

With respect to IndyMac's preemption defense, the court first noted that HOLA vested OTS with the "principal responsibility for regulating federally chartered savings associations"; that in 12 CFR 560.2, OTS had stated "its intention to occupy the entire field of the lending regulation for FSAs" and that "[p]ursuant to the plenary authority granted under HOLA to regulate the operations of FSAs," OTS had issued "extensive regulations governing [their] operations" (2008 WL 3992304, *5, 2008 US Dist LEXIS 65337,*17-18). The judge then turned to 12 CFR 560.2 (b) and (c), observing that included among the "illustrative examples of the types of state laws preempted by OTS regulation" were "state laws purporting to impose requirements regarding loan-related fees (§ 560.2[(b) (5)]), disclosure and advertising (§ 560.2[(b) (9)]), and processing or origination of mortgages (§ 560.2[(b) (10)])"; and that 12 CFR 560.2 (c) "identif[ied] certain types of state laws, such as state contract, tort, and commercial law, that [were] not preempted to the extent that they only incidentally affect[ed]" a thrift's "lending operations" (2008 WL 3992304, *5, 2008 US Dist LEXIS 65337, *18-19 [internal quotation marks omitted]).

IndyMac argued that "the plaintiff's state law claims [were] specifically directed at loan-related fees as contemplated by Section 560.2(b)(5) and directly challenge[d] both IndyMac's disclosure and advertising and the processing or origination of mortgages as described in Sections 560.2(b)(9) and 560.2(b)(10)," such that "the Court should not even reach the 'incidental effect' analysis contained in section (c)" (2008 WL 3992304, *6, 2008 US Dist LEXIS 65337, *19 [internal quotation marks omitted]). To evaluate IndyMac's argument, the court turned to OTS's 1996 regulation because "[w]hen considering, as here, *laws that do not on their face purport to impose regulations on the areas listed in paragraph (b)*, it is necessary to determine *whether the law, as applied to the claims raised, is the type of law listed in paragraph (b)*" (2008 WL 3992304, *6, 2008 US Dist LEXIS 65337, *20 [emphases added]; see also two cases discussed by the court as examples of the foregoing proposition: *Silvas v E\*Trade Mtge. Corp.*, 514 F3d 1001 [9th Cir 2008] [holding claims under the California deceptive practice statute for allegedly faulty disclosure and an allegedly improper lock-in fee preempted under 12 CFR 560.2 (b) (9) and (b) (5), respectively] and *In re Ocwen Loan Servicing, LLC Mtge. Servicing Litig.*, 491 F3d 638 [7th Cir 2007] [concluding that some of the claims asserted under the California deceptive

practice statute would be preempted and others would not]). Of course, the plaintiff countered that "her state law claims challenging IndyMac's appraisal practices [were] state contract and commercial challenges that [fell] within the exceptions outlined in paragraph (c)," while IndyMac insisted that she was "merely trying to circumvent HOLA preemption by pleading plainly preempted claims as violations of state contract law and consumer protection statutes" (2008 WL 3992304, *7, 2008 US Dist LEXIS 65337, *22-23).

The judge summed up the issue that he was required to decide as follows:

> "The question before the Court is whether the plaintiff's claims under state contract law and California and New York state deceptive practice statutes are brought in an effort to regulate IndyMac's appraisal practices *in a way that interferes with an area defined in paragraph (b) or more than incidentally affects IndyMac's federally regulated thrift operations for purposes of paragraph (c)*" (2008 WL 3992304, *7, 2008 US Dist LEXIS 65337, *23 [emphasis added]).

Evaluating this question first in the context of the California deceptive practice statute, the judge concluded that the plaintiff did, indeed, attempt to apply this statute to "impose requirements in areas explicitly preempted by federal law" because the challenged appraisal practices "appear[ed] to relate directly to the processing or origination of mortgages" and thus fell within 12 CFR 560.2 (b) (10); and "relate[d] directly to the appraisal fee . . . charged in connection with the mortgage," and thus sought to regulate loan-related fees within the meaning of 12 CFR 560.2 (b) (5) (2008 WL 3992304, *8, 2008 US Dist LEXIS 65337, *25). Further, by challenging the disclosure made to her, the plaintiff also attempted to use the deceptive practices statute "to regulate the disclosures made in connection with the mortgage," as encompassed by 12 CFR 560.2 (b) (9). The judge therefore opined that "as applied to the plaintiff's allegations," the California statute was preempted under 12 CFR 560.2 (b) (id.).

Given his disposition of the case, the judge did not need to analyze whether the plaintiff's claim under the California deceptive practice statute "more than incidentally affect[ed]" lending within the meaning of 12 CFR 560.2 (c). He nonetheless added that the statute also ran afoul of this provision because "[t]he

practices the plaintiff [sought] to regulate relate[d] directly to the valuation of the collateral security for loans"; and "[t]he relief the plaintiff [sought] would plainly set particular requirements on IndyMac's lending operations" (2008 WL 3992304, *8, 2008 US Dist LEXIS 65337, *26).

Applying the same analysis, the court held that the plaintiff's claim under New York's General Business Law § 349 was likewise preempted because "[a]s applied to the allegations in this case, [she was] relying on a state law to regulate a loan-related fee, disclosure of information relating to the fee, and the processing and origination of a mortgage," which were preempted under 12 CFR 560.2 (b) (5), (9) and (10), respectively. Moreover, although it was therefore again unnecessary to analyze the statute's application under 12 CFR 560.2 (c), the judge concluded that "the New York statute as applied in this case more than incidentally affect[ed] federal thrift lending operations" (2008 WL 3992304, *9, 2008 US Dist LEXIS 65337, *27, *28).

Next, the court addressed the plaintiff's contract claim and her claim for unjust enrichment. As to the former, the judge first observed that plaintiff did not allege that IndyMac had breached any specific provision of any contract that she had entered into with the thrift; rather, "the gist" of her claim, as was the case with her state statutory claims, was that she was provided with an inaccurate appraisal, thereby breaching the covenant of good faith and fair dealing. The court decided that the plaintiff's state law claim for breach of contract was foreclosed by 12 CFR 560.2 (10) because "like the claims under California and New York deceptive practice statutes, . . . it relies on state law purporting to impose a requirement on the processing and origination of the mortgage" (2008 WL 3992304, *10, 2008 US Dist LEXIS 65337, *31). And as he had before, the judge also evaluated the claim under 12 CFR 560.2 (c), concluding that the regulation sought by the plaintiff would more than incidentally affect IndyMac's lending operations. As he explained,

> "[t]he contract claim is simply another means to attempt to regulate the method used by IndyMac to assess the value of collateral in securing its loans. Granting the plaintiff the relief she seeks would have the same effect as a direct regulation of appraisal practices—causing IndyMac to alter the

methods it uses to evaluate loans and more than incidentally affecting lending operations of federally chartered savings associations" (2008 WL 3992304, *10, 2008 US Dist LEXIS 65337, *32).

Finally, the judge declared that the plaintiff's unjust enrichment claim failed to state a cause of action "because it [was] a quasi contractual claim and the relationship between the plaintiff and IndyMac [was] regulated by contract"; and "[w]hile there [might] be a dispute as to the scope of the contract, there [was] no dispute as to the existence of the contract between the plaintiff and IndyMac" (id.). As a result, any potentially valid claim for unjust enrichment would be preempted for the same reasons stated with respect to the plaintiff's contract claim.[2]

## Spears

The plaintiffs brought this class action against defendants Washington Mutual Bank FA (WaMu), an FSA, First American eAppraiseIT (a defendant in this case) and Lender's Service, Inc. (LSI), claiming that they "participated in a scheme to provide home-loan mortgage borrowers with inflated appraisals of the property they sought to purchase" (2009 WL 605835, *1, 2009 US Dist LEXIS 21646, *2). Specifically, the complaint alleged that WaMu retained First American eAppraiseIT and LSI to run its appraisal program; that subsequently, First American eAppraiseIT and LSI performed virtually all of WaMu's appraisals, and, as a result, WaMu's borrowers became these firms' largest source of business; that WaMu's loan origination staff created a list of "preferred appraisers" to perform appraisals for WaMu borrowers; that WaMu maintained the contractual right with these "preferred appraisers" to challenge an appraisal by requesting reconsideration; that WaMu would use such a request to coerce First American eAppraiseIT and LSI to increase the appraised value of property; and that WaMu asked First American eAppraiseIT and LSI to hire business managers to be given authority to override the values determined by third-party appraisers.

The plaintiffs asserted that this alleged scheme violated a federal law and four provisions of California consumer protection statutes, and constituted a breach of contract and unjust enrichment. After the complaint was filed, the FDIC was

---

2. The court also determined that the plaintiff failed to state a claim under either of the federal laws asserted, and so dismissed the complaint.

substituted as receiver for WaMu, and the plaintiffs stipulated to dismiss all claims against WaMu/the FDIC. First American eAppraiseIT and LSI moved to dismiss all claims.

The defendants argued that the plaintiffs' state statutory claims were preempted by HOLA. The judge followed the analysis employed by the *Cedeno* court under OTS's 1996 regulations—i.e., he first looked at whether, *as applied*, the four state statutory provisions were the type of state law contemplated under 12 CFR 560.2 (b). The plaintiffs based one cause of action on First American eAppraiseIT's alleged unlawful conduct in contravention of the Uniform Standards of Professional Appraisal Practice (USPAP); specifically, the plaintiffs asserted that the appraisal management firm violated USPAP's requirement that "an appraisal be performed with impartiality, objectivity, and independence" (2009 WL 605835, *5, 2009 US Dist LEXIS 21646, *16). They based two other causes of action on the same conduct, asserting that "the impartiality of the offered appraisals constituted unfair and fraudulent business practices" (*id.*) Finally, the plaintiffs alleged in a fourth cause of action that First American eAppraiseIT "represented that their home appraisal services were of a standard or quality that they were not" in violation of state statute (2009 WL 605835, *5, 2009 US Dist LEXIS 21646, *16-17).

The judge concluded that

> "*[e]ach of these claims relate directly to the processing and origination of mortgages.* Appraisals are required for many real-estate transactions. 12 C.F.R. 34.43 (requiring a certified or licensed appraisal for all real-estate financial transactions except those falling within enumerated exceptions). And those appraisals must be performed according to certain standards in order to protect the public and federal financial interests. 12 C.F.R. 34.41(b). *Indeed, plaintiffs' theory of the case, that lenders and appraisers conspired to inflate appraisals in order to increase mortgage resale prices, demonstrates the importance and interrelationship of impartial appraisals to mortgage origination and servicing*" (2009 WL 605835, *6, 2009 US Dist LEXIS 21646, *17 [emphases added]).

Citing *Cedeno*, the court held that these state statutory claims, "as applied, relate[d] to the processing and origination of, and

participation in, mortgages, and [were] thus preempted under § 560.2(b)(10)" (*id.*).[3]

## III.

## Analysis

This complaint and the complaints in *Cedeno* and *Spears* present the same basic storyline: the FSAs (IndyMac in *Cedeno*; WaMu in this case and *Spears*) shifted from a business model where they held real estate mortgages until the underlying loans were repaid by the borrowers to one where they sold security interests in aggregated mortgages in the financial markets; and in order to maximize their profits from this endeavor, the FSAs coerced or conspired with the appraisal management firms to which they outsourced their real estate appraisal work (unidentified appraisal management firms and appraisers in *Cedeno*; First American eAppraiseIT in this case and *Spears*) to inflate the appraised value of the real property backing the home loans that they made. As the majority put it, "the crux of the Attorney General's complaint is that defendants [thereby] engaged in unlawful and deceptive business practices in that they failed to adhere to the requirements of USPAP," as required by 12 CFR 564.4 (majority op at 183).

As an initial matter, there can be no doubt that real estate appraisals affect the lending operations of an FSA. This is why Congress amended HOLA in 1989 by adopting the Financial

---

3. In addition to dismissing the four state statutory claims on the basis of HOLA preemption, the court also granted LSI's motion to dismiss on the basis of lack of standing; denied First American eAppraiseIT's motion to dismiss one of the two claims asserted under federal law, and granted its motion to dismiss the other one; granted its motion to dismiss the breach of contract claim; and granted the plaintiffs 20 days' leave to amend. Although the judge concluded that the plaintiffs failed to plead an action for breach of contract, he advised them that in the event they chose to amend their breach of contract claim, he would revisit the issue of preemption with respect to it. He also decided that the unjust enrichment claim was subject to dismissal under California law because it had the same basis as the single federal law claim remaining in the action, which furnished an adequate alternative form of relief. Finally, the judge agreed with First American eAppraiseIT that, even if the state law claims had not been preempted, the plaintiffs failed to state a claim because there was no showing of actual damages, as required by the statutes; i.e., "[b]ecause plaintiffs would have had to pay for the appraisal in order to take out the loan, they would have paid an appraisal fee whether the appraisal provided was defective or not. That is, had the appraisal been performed lawfully and in good faith, plaintiffs provide[d] no basis on which to conclude that they would have been better off" (2009 WL 605835, *1, 2009 US Dist LEXIS 21646,*19).

Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) (Pub L 101-73, 103 US Stat 183). FIRREA expanded federal oversight of FSAs explicitly to include review and regulation of their real estate appraisal practices (12 USC § 3331 *et seq.*). In general, Congress sought thereby to improve lending by requiring real estate appraisals used in connection with federally-related transactions to be performed in writing, in accordance with uniform standards (i.e., USPAP) by competent and independent appraisers (*see* 12 CFR part 564). As the House Report recommending passage of FIRREA pointed out, "[a]ppraisal deficiencies go hand-in-hand with poor underwriting and administration standards" (HR Rep 101-54[I], 101st Cong, 1st Sess, reprinted in 1989 US Code Cong & Admin News, at 96). "Given the crucial role appraisals play in the safety and soundness of the underwriting of real estate related loans and investments," Congress envisaged that FIRREA would "protect Federal financial and public policy interests in real estate related financial transactions requiring the services of an appraiser" (*id.* at 274).

This suit is preempted because, in substance, and particularly on the allegations before us, it challenges a thrift's lending practices. The complaint details alleged collusion between thrift managers and appraisers, the precise activity that Congress found would undermine sound real estate loans. Even if it were theoretically possible for a lawsuit in this vein not to be preempted, it cannot be the case here, where the sole relevance of the alleged misrepresentations is how they affected loans and lending. That is, while the State claims that First American eAppraiseIT's misrepresentations to the public are an independent harm, they are only harmful to the extent they affect *lending practices*; put another way, the only reason the appraisers' alleged misrepresentations matter is because of the way in which they affected the thrift's underwriting. Since those matters are properly matters of federal law, this suit should not proceed. For the same reasons, the *Cedeno* and *Spears* courts both determined that allegedly fraudulent real estate appraisal practices concerned mortgages, and that suits seeking to impose liability for these practices were preempted as attempts to impose substantive requirements in an area regulated by OTS (*Cedeno*, 2008 WL 3992304, *8, 2008 US Dist LEXIS 65337, *25; *Spears*, 2009 WL 605835, *6, 2009 US Dist LEXIS 21646 at *17).

The bulk of the complaint in this case alleges, in effect, a failure to disclose, an area that is expressly preempted (12 CFR

560.2 [b] [9]); the Attorney General seeks to recoup the appraisal fees paid to the thrift by borrowers, and laws that affect loan-related fees are also expressly preempted (*id.* 560.2 [b] [5]). More broadly, appraisal is so important to mortgage underwriting that it cannot be separated from the processing or origination of mortgages (*id.* 560.2 [b] [10]), as the courts concluded in *Cedeno* and *Spears*. Even if the Attorney General's claims arguably do not fall within paragraph (b), they affect lending; therefore, they are presumptively preempted and this presumption "can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c)" (61 Fed Reg at 50966). But the Congressional findings in support of FIRREA make clear that a thrift's appraisal practices do not merely "incidentally affect" lending within the meaning of paragraph (c); they are, in fact, critical to the making of safe and sound real estate loans. As a result, the Attorney General seeks to regulate practices directly related to the valuation of the collateral security for such home loans (*see Cedeno*, 2008 WL 3992304, *8, 2008 US Dist LEXIS 65337, *26-27).

The majority bases its conclusion that the Attorney General's claims are *not* preempted principally on the notion that FIRREA "governs the regulation of appraisal management companies and explicitly envisioned a cooperative effort between federal and state authorities to ensure that real estate appraisal reports comport with USPAP" (majority op at 184).[4] FIRREA establishes a role for the states, but that role is confined to its traditional one of certifying and licensing individual appraisers (*see* 12 USC §§ 3346-3348).[5] Notably, FIRREA did not purport to amend HOLA preemption so as to allow the states to regulate

---

**4.** The majority asserts that two federal district courts' opinions are "consistent with [its] analysis" (majority op at 184 n 5). Unlike *Cedeno* and *Spears*, the facts and legal issues in those cases do not correspond with the facts and legal issues here. For example, in *Bolden v KB Home* (618 F Supp 2d 1196, 1201 [CD Cal 2008]), the issue was whether FIRREA or the OTS regulation created "complete preemption," a concept distinct from field preemption— and not an issue in this case—which pertains to whether a federal statute so displaces a state cause of action that, even if pleaded under state law, it actually arises under federal law and creates removal jurisdiction (*see e.g. Beneficial Nat. Bank v Anderson*, 539 US 1, 6-8 [2003]). *Fidelity Natl. Info. Solution, Inc. v Sinclair* (2004 WL 764834, *1-3, 2004 US Dist LEXIS 6687, *1-8 [ED Pa 2004]) directly concerned a state's authority to require those performing appraisals to be licensed, not whether appraisals affected FSAs' lending operations.

**5.** Even there, OTS cautioned that it might "from time to time, impose additional qualification criteria for certified appraisers performing appraisals in

a thrift's real estate appraisal practices. As the Dodd-Frank Act shows, Congress certainly knows how to draft provisions that expressly disclaim any intent to preempt nonconflicting state statutes falling within the same subject area as federal law. And since real estate appraisal activities clearly fall within the subject area pervasively regulated and occupied by HOLA—a thrift's lending operations—Congress would have to have *expressly* narrowed HOLA preemption by carving out an exception for real estate appraisal practices: by definition, there can be no such thing as an implied exception from field preemption.

Finally, the Attorney General attempts to get around *Cedeno* and *Spears* the only way he can—by characterizing these decisions as "wrongly decided." He faults both judges for "overlook-[ing] the impact of FIRREA on the field-preemption analysis." This of course assumes that FIRREA altered HOLA preemption with respect to the real estate appraisal activities that are the subject of this lawsuit, a proposition for which—as already explained—there is simply no support. He also notes that the lawsuit in *Cedeno* was brought against the FSA, although the defendant in *Spears* was concededly the appraisal management company—indeed, it was First American eAppraiseIT. The fact is, if the Attorney General's preemption analysis is correct, it should make no difference whether the appraisal practices addressed in this lawsuit were carried out by the thrift's in-house appraisers (called "staff appraisers" in the regulations; *see* 12 CFR 564.5 [a]) or outside appraisal firms to which the thrift outsourced its real estate appraisal work (called "fee appraisers" in the regulations; *see id.* 564.5 [b]). OTS's regulations governing real estate appraisals apply equally to the staff and fee appraisers. As First American eAppraiseIT notes, the Attorney General is merely seeking by this lawsuit to regulate a thrift's lending activities indirectly by suing the appraisal management company to which the thrift lawfully assigned its authorized banking activities.

In sum, I believe that *Cedeno* and *Spears* were correctly decided. In any event, we should, in my view, adopt the federal courts' interpretation of a federal statute unless that interpretation appears to be plainly wrong. And even if one disagrees with the decisions in *Cedeno* and *Spears*, they are certainly reasonable applications of HOLA preemption in the context of real

connection with federally related transactions within its jurisdiction" (*see* 12 CFR 564.2 [j]).

estate appraisal practices relating to the underwriting of home loans made by thrifts. Applying the analysis of those cases to the nearly identical facts here, I conclude that this lawsuit is preempted by HOLA.

Chief Judge LIPPMAN and Judges GRAFFEO, SMITH, PIGOTT and JONES concur with Judge CIPARICK; Judge READ dissents and votes to reverse in a separate opinion.

Order affirmed, etc.